[No. A045457. First Dist., Div. Four. June 14, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN LOUIS RICARDI, Defendant and Appellant.

**COUNSEL**

Fern M. Laethem, State Public Defender, under appointment by the Court of Appeal, and Victor J. Morse, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Blair W. Hoffman and Jeremy Friedlander, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**PERLEY, J.**—Defendant Steven Louis Ricardi was driving under the influence of alcohol when his car crossed the center divider of a highway and collided head-on with another vehicle. The driver of the other car was killed and a passenger in the other car was seriously injured. Defendant was convicted by a jury of second degree murder and other offenses arising from the accident. The principal contention on appeal is that the jury should have been instructed that defendant's intoxication may have rendered him incapable of harboring the malice aforethought required for murder. Since this argument is supported by the applicable authorities we must reverse the murder conviction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant has no less than six prior drunk-driving convictions, all based on guilty pleas, including one conviction stemming from an accident that injured another driver.

His first conviction for drunk driving occurred in October of 1973, when he was 22 years old. He was fined approximately $300.

Defendant's second conviction for drunk driving occurred less than a year later, in October of 1974. He was fined $315, ordered to spend two days in county jail, and placed on probation for one year.

Defendant's third conviction for drunk driving occurred in September of 1979 after a police officer had stopped defendant's car because it was weaving within its lane and found defendant to have a blood-alcohol content of .25 percent. Defendant told the probation officer: "I had gone to a bar with a few friends and had much more than I would normally have to drink, and didn't realize how drunk I was. Then the worst thing I could possibly do was drive my car, which is what I did." Defendant was evaluated by Alcohol Information Rehabilitation Services, which recommended him for the Post Conviction Drinking Driver's Program (PCDD Program), which defendant was willing to enter. Defendant was fined $350, ordered to spend eight days in county jail, and placed on probation for eighteen months. Among the terms of probation were that defendant totally abstain from the use of alcoholic beverages and complete the PCDD Program.

Defendant's fourth drunk-driving conviction occurred in May of 1981, again after a police officer had stopped defendant's car because it was weaving within its lane and found defendant to have a blood-alcohol content of .25 percent. Defendant was fined $650, ordered to spend 11 days in county jail, and placed on probation for 3 years. Defendant's probation was terminated in May of 1983.

Defendant's fifth drunk-driving conviction occurred in January of 1986. Driving at 80 m.p.h., defendant's car hit a vehicle and forced it off the freeway. The other car flipped over, and its driver was injured. Defendant's blood-alcohol level was measured at .19 percent. Although originally charged as a felony, defendant was ultimately convicted of a misdemeanor. No jail time was imposed, but defendant was fined $685 and placed on probation for three years. Again defendant was ordered to abstain from alcohol and his driving privileges were restricted for 90 days.

Defendant's sixth drunk-driving conviction occurred less than a year later, in October of 1986. He was stopped after his car was observed weaving in its lane. His blood-alcohol level was measured at .19 percent. Having already entered yet another treatment program, defendant was fined approximately $1,100, ordered to spend 10 days in county jail, and once again admitted to probation on condition he complete the PCDD Program. He

was further ordered to abstain from alcohol, submit to testing, and his driving privileges were restricted for one year.

By this time defendant had completed several alcohol rehabilitation programs on both an out-patient and a residential basis, participated in innumerable sessions with counselors, and attended meetings of Alcoholics Anonymous. During these courses he was repeatedly made aware of the dangers of drinking and driving, together with California's increasingly stern penalties for commingling these activities. Confessing to his physician that he was an alcoholic, defendant in 1980 voluntarily began taking Antabuse, a drug which produces severe and incapacitating reactions when taken with alcohol. In June of 1987 defendant renewed his prescription for Antabuse, getting enough of the drug to last for four months.

Defendant spent the afternoon of August 29, 1987, drinking more than 10 beers at the house of friends in Livermore. He left around 5 p.m., intending to drive his pickup to Martinez. About an hour later, having gone approximately 35 miles, defendant's truck drifted out of its lane on Taylor Boulevard in Pleasant Hill, crossed a center divider (which it briefly straddled), snapped a road sign, and collided head-on into an automobile being driven in the opposite direction by Katrina LaMar, who was one week shy of her 16th birthday. Katrina died of head injuries; her mother Emma, who was sitting in the front passenger seat, sustained multiple severe bone fractures. Witnesses saw no attempt made to correct the drift of defendant's truck, and heard no brakes being applied. Officers who removed defendant from his pickup noted that he smelled of alcohol, that his seatbelt was fastened, and there were no skid marks indicating that defendant had attempted to brake his vehicle prior to the collision.

A blood sample taken from defendant at 7:30 that night showed a blood-alcohol content of .17 percent. From this figure an expert toxicologist believed that defendant's ability to drive was significantly impaired, and that the estimated alcohol content of defendant's blood at the time of the accident was approximately .19 percent.

Defendant testified that, although he feels the effect of alcohol after drinking three beers, he did not think at the time he left his friends' house that he was under the influence or that he would be caught or that he would have an accident. Conceding that he had in the past felt the need to exercise self-control about drinking, defendant nevertheless believed that he was not "automatically" an unsafe driver after he had been drinking. Defendant knew while he was drinking at his friends' house that he would have to drive home, yet he did not stay overnight as he had in the past. Defendant had no memory of anything that happened after he left his friends' house.

After hearing this evidence, a jury returned verdicts finding defendant guilty as charged of (1) second degree murder (Pen. Code, § 187); (2) causing injury while driving under the influence of alcohol and doing acts forbidden by law (Veh. Code, § 23153, subd. (a)); (3) causing injury while driving with a blood-alcohol level of at least .10 percent and doing acts forbidden by law[1] (former Veh. Code, § 23153, subd. (b)); and (4) operating a vehicle in violation of a restriction on his driver's license (Veh. Code, § 14603). The jury further found true allegations in counts two and three that twice within the previous five years defendant had been convicted of drunk-driving not resulting in injury (Veh. Code, § 23152, subds. (a), (b)).

The trial court sentenced defendant as follows: count one—fifteen years to life in the state prison; count two—the aggravated term of four years, to be served consecutive to the term for count one; count three—the aggravated term of four years, execution of which was stayed; and count four—six months in the county jail. Defendant was also ordered to make restitution in the amount of $10,000 to Mrs. LaMar.

This timely appeal ensued.

## II. Discussion

The trial court refused defendant's request that the jury be instructed with CALJIC No. 4.21 ("Voluntary Intoxication—When Relevant To Specific Intent").[2] This instruction reads as follows: "In the crime of _____ of which the defendant is accused [in Count[s] _____ of the information], a necessary element is the existence in the mind of the defendant of the [specific intent to _____ ] [mental state[s] of _____ ]. [¶] If the evidence shows that the defendant was intoxicated at the time of the alleged crime, you should consider that fact in determining whether defendant had such [specific intent] [mental state]. [¶] If from all the evidence you have a reasonable doubt whether the defendant formed such [specific intent] [mental state[s]], you must find that [he] [she] did not have such [specific intent] [mental state[s]]." We are unaware of any California case that has considered the necessity for this instruction in the context of a second degree drunk-driving murder prosecution. We hold that under California law the instruction was required.

---

[1] The "act forbidden by law" required by both subdivisions of section 23153 were identified in the information as failing to drive on the right side of a divided roadway (Veh. Code, § 21651, subd. (b)), and driving across the dividing section of a roadway (Veh. Code, § 21651, subd. (a)).

[2] The record does not indicate the trial court's reasons for refusing to give this instruction.

The applicable statutes are Penal Code sections 22 and 187.[3] Section 187 provides in pertinent part that "[m]urder is the unlawful killing of a human being . . . with malice aforethought." Section 22, subdivision (b) provides that "[e]vidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged." Sections 22 and 187 indicate that murder is a "specific intent" crime to which voluntary intoxication is a defense. They make no exception for murder in circumstances that would support a finding of implied malice (§ 188), even where those circumstances include drunk driving (see *People* v. *Watson* (1981) 30 Cal.3d 290 [179 Cal.Rptr. 43, 637 P.2d 279]). Although we will proceed to examine other authorities, we must ultimately conclude that these statutes are dispositive.

■ The cases as well as the statutes support defendant. "The distinction between specific and general intent crimes evolved as a judicial response to the problem of the intoxicated offender." (*People* v. *Hood* (1969) 1 Cal.3d 444, 455 [82 Cal.Rptr. 618, 462 P.2d 370].) ■ "Evidence of voluntary intoxication may be introduced to show the absence of specific intent." (*People* v. *Gutierrez* (1986) 180 Cal.App.3d 1076, 1081 [225 Cal.Rptr. 885].) Murder is regarded as a specific intent crime for purposes of this principle. (See, e.g., 1 Witkin and Epstein, *Cal. Criminal Law* (2d ed. 1988) § 213, pp. 244-245 and authorities cited; see also CALJIC (4th ed.) Appen. D [listing murder as a specific intent crime].) ■ The crime of murder is said to have a "mental component" even when the requisite malice aforethought is only implied. (*People* v. *Patterson* (1989) 49 Cal.3d 615, 626 [262 Cal.Rptr. 195, 778 P.2d 549].) In cases of implied malice it must be shown that the defendant "knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life." (*People* v. *Watson, supra*, 30 Cal.3d at p. 300, internal quotation marks omitted.) It must appear that the defendant "*actually appreciated* the risk involved." (*Id.*, at p. 297, italics in original.) Since voluntary intoxication may affect the defendant's mental state it has been viewed as a defense to charges of implied malice. (See *People* v. *Conley* (1966) 64 Cal.2d 310, 321-322 [49 Cal.Rptr. 815, 411 P.2d 911] [discussion framed in terms of diminished capacity].)

■ *Watson* itself suggests that a voluntary intoxication defense may be properly raised in the context of drunk-driving murder. The majority opinion in that case states: "We need not consider defendant's contention that the degree of his intoxication rendered him incapable of entertaining malice. Such an argument would relate to a diminished capacity defense which *properly should be raised and considered* at trial." (*People* v. *Watson, supra*,

---

[3] All further statutory references are to the Penal Code.

30 Cal.3d at p. 301, italics added.) Such dicta is persuasive if not mandatory authority, and the highlighted language implies that intoxication may be a mitigating factor. (See *Paley* v. *Superior Court* (1955) 137 Cal.App.2d 450, 460 [90 P.2d 617] [dicta apparently "intended for guidance of court and attorneys upon a new trial" deemed especially persuasive]; and Luria, *Death on the Highway: Reckless Driving as Murder* (1988) 67 Or.L.Rev. 799, 807, fn. 46 [hereafter *Reckless Driving Murder*; *Watson* suggests that intoxication would raise a diminished capacity defense]). Abolition of the diminished capacity defense does not alter our interpretation because evidence of intoxication that formerly bore upon capacity may still be used to show that a requisite mental state has not "actually" been formed. (§ 22; *People* v. *Olea* (1984) 160 Cal.App.3d 891, 896-897 [206 Cal.Rptr. 829]; see also *People* v. *Jackson* (1984) 152 Cal.App.3d 961, 968 [199 Cal.Rptr. 848] [exclusion of capacity evidence does not prevent accused from disproving mental state necessary to a charge].)

Respondent notes that a majority of the drafters of the Model Penal Code were of the view that "awareness of the potential consequences of excessive drinking on the capacity of human beings to gauge the risks incident to their conduct is by now so dispersed in our culture that it is not unfair to postulate a general equivalence between the risks created by the conduct of the drunken actor and the risks created by his conduct in becoming drunk." (Model Pen. Code & Commentaries (1985) com. to § 2.08, p. 359.) The Model Penal Code thus provides that "[w]hen recklessness establishes an element of the offense, if the actor, due to self-induced intoxication, is unaware of a risk of which he would have been aware had he been sober, such unawareness is immaterial." (Model Pen. Code, § 2.08, subd. (2).) "Recklessness," as used in this rule, covers the Model Penal Code equivalent of implied-malice murder in California. (See 2 LaFave & Scott, Substantive Criminal Law (1986) § 7.4, pp. 205-206 [discussion of rule in context of "depraved heart" murder]; and Note, *People* v. *Watson: Drunk Driving Homicide—Murder or Enhanced Manslaughter?* (1983) 71 Cal.L.Rev. 1298, 1311, fn. 77 [hereafter *Drunk Driving Homicide*].) A number of states have adopted the Model Penal Code rule. (1 LaFave & Scott, *supra*, § 4.10, p. 557, fn. 46 [listing 15 states].)

Reasonable minds have differed about the propriety of this rule. (See generally Model Pen. Code, § 2.08, com. at pp. 358-359 [arguments for and against the rule].) Learned Hand thought that voluntary intoxication should be a defense to recklessness where recklessness is defined in terms of a "conscious" disregard of a substantial and unjustifiable risk. (*Id.*, at p. 357.) On the other hand, it has been suggested that it would be appropriate to preclude a voluntary intoxication defense in cases of "abandoned and malignant heart" murder, on the basis that one "who unconsciously creates

risk because he is voluntarily drunk is perhaps morally worse than one who does so because he is sober but mentally deficient." (2 LaFave & Scott, *supra*, § 7.4, p. 205.) Several commentaries have suggested that the Model Penal Code rule is supported by a majority of the cases in other jurisdictions. (*Ibid*; Model Pen. Code, § 2.08, com. at p. 359; *Reckless Driving Murder, supra*, 67 Or.L.Rev. at p. 807; but see Hoffheimer, *Intoxication and Extreme-Recklessness Murder: Presenting and Preserving the Issues* (1989) 25 Crim.L.Bull. 123, 125, fn. 8 ["few jurisdictions have actually decided the issue in the context of the heightened recklessness needed to establish malice to support a murder conviction"]; and 1 Robinson, Criminal Law Defenses (1984) § 65(a), pp. 289-293 [different states' general approaches to voluntary intoxication defense far from uniform].)

We believe that the Model Penal Code rule makes especially good sense in a case like the one before us. Drunkenness should not be a defense to drunk-driving murder. This results in the anomaly that the most intoxicated and dangerous drivers are the least likely to be convicted. (See *Drunk Driving Homicide, supra*, 71 Cal.L.Rev. at pp. 1311-1312.) But whatever its merits, we find no basis in California law for application of the Model Penal Code rule in this instance.

Looking at the statutes, we note that the Legislature is aware of the Model Penal Code rule, having adopted it in the context of crimes against property. (See § 450, subd. (f) [defining the term "recklessly" for purposes of chapter on arson]; *In re Stonewall F.* (1989) 208 Cal.App.3d 1054, 1066, fn. 10 [256 Cal.Rptr. 578] [§ 450, subd. (f) is derived from Model Pen. Code § 2.08].) The Legislature is also aware that drunk driving may lead to a charge of second degree murder under the reasoning of *Watson*. (See § 191.5, subd. (d) and § 192, subd. (c) [directing that the vehicular manslaughter statutes not be construed to prohibit murder charges consistent with *Watson*].) The Legislature has amended section 22 as well as section 188's definition of malice since the decision in *Watson* (Stats. 1982, ch. 893, §§ 2, 4, pp. 3317-3318). If it thought an exception to the voluntary intoxication defense advisable in the *Watson* context, then presumably it would have enacted one.

Turning to the cases, we have found only two citations to the Model Penal Code rule apart from *In re Stonewall F., supra*. The rule was invoked in *People v. Brown* (1988) 46 Cal.3d 432, 444-445, fn. 7 [250 Cal.Rptr. 604, 758 P.2d 1135], and *People v. Finney* (1980) 110 Cal.App.3d 705, 714 [168 Cal.Rptr. 80], in upholding convictions for killing and assaulting a peace officer, respectively, under statutes penalizing an accused who "reasonably should know" the victim is a peace officer (§§ 190.2, subd. (a)(7), 245, subd. (c)). The *Finney* court reasoned that section 22 should not be applied under

a provision authorizing convictions for "culpable ignorance," and the *Brown* court determined that it was not constitutionally required to recognize a "self-induced 'diminished capacity'" defense in that context. (*People* v. *Brown, supra,* at p. 444, fn. 7; *People* v. *Finney, supra,* at p. 713.) Neither of these cases is precedent for application of the Model Penal Code rule in our case, however, because it is precisely the difference between a risk that is actually appreciated, and a risk that objectively should have been appreciated, that separates murder from vehicular manslaughter under *Watson.* (*People* v. *Watson, supra,* 30 Cal.3d at pp. 296-297.)[4]

Respondent's only other argument is premised on the following passage in *Watson*: "'One who wilfully consumes alcoholic beverages to the point of intoxication, knowing that he thereafter must operate a motor vehicle, thereby combining sharply impaired physical and mental faculties with a vehicle capable of great force and speed, reasonably may be held to exhibit a conscious disregard of the safety of others.'" (*People* v. *Watson, supra,* 30 Cal.3d at pp. 300-301, quoting *Taylor* v. *Superior Court* (1979) 24 Cal.3d 890, 897 [157 Cal.Rptr. 693, 598 P.2d 854].) Although the argument is phrased in terms of a somewhat abstract distinction between "malice-demonstrating acts" preceding "killing acts," it seems to boil down to the following proposition: since *Watson* indicates that the act of drinking in anticipation of driving may itself be indicative of malice, the jury should not be instructed to view the intoxication produced by that drinking as a defense. In respondent's vernacular, an instruction on voluntary intoxication was not required because the "malice-demonstrating" act, drinking in anticipation of driving, occurred when defendant was still sober. Defendant responds that his state of mind after he became drunk and started driving was also relevant, citing *People* v. *Olivas* (1985) 172 Cal.App.3d 984, 988-989 [218 Cal.Rptr. 567], to the effect that "[t]he criminal act underlying vehicular murder is not use of intoxicating substances in anticipation of driving, but is driving under the influence with conscious disregard for life. Nothing in *Watson* states that the former is necessary to a finding of the latter."

■ As we read *Watson,* it is for the jury to decide whether all of the circumstances preceding a fatal accident caused by a drunk driver are sufficient to establish implied malice. ■ ■■ ■ ■ Those cir-

---

[4] It is likewise irrelevant for our purposes that reasoning akin to the Model Penal Code rule has been applied in the context of involuntary manslaughter. CALJIC No. 8.47 ("Involuntary Manslaughter—Killing While Unconscious Due To Voluntary Intoxication") provides in pertinent part that "[w]hen a person voluntarily induces [his] [her] own intoxication to the point of unconsciousness, [he] [she] assumes the risk that while unconscious [he] [she] will commit acts inherently dangerous to human life or safety. *Under such circumstances, the law implies criminal negligence.*" (Italics added.) In view of the highlighted language it cannot be assumed that such reasoning applies in the context of second degree murder.

cumstances will necessarily include both drinking, and driving while intoxicated,[5] and the jury may appropriately focus on the accused's mental state at both points. The accused can point out that there would have been no murder unless he had proceeded to drive after drinking, and argue that he was too intoxicated when he took the wheel to actually appreciate the risks associated with his driving. The evidence in this case suggests that defendant was not too inebriated to know what he was doing when he set out on the highway. ■ Instructing the jury to consider intoxication in connection with the accused's mental state does not preclude the prosecution from arguing, in an appropriate case and in accordance with *Watson,* that the jury may consider drinking in anticipation of driving as evidence of malice. (Cf. Model Pen. Code, § 2.08, com. at p. 357 [Learned Hand and others who argued against the Model Penal Code rule "pointed out that liability may still arise . . . based on the actor's awareness of risk while getting drunk, as when he knows that he must ultimately drive a car"].) Such an argument would be appropriate in defendant's case, where the evidence suggests that he knew he would have to drive when he began drinking, and his past experience permits the inference that he actually

---

[5] Additional circumstances must be sufficiently egregious to justify a murder charge (see *People* v. *Watson, supra,* 30 Cal.3d at p. 301 [discouraging routine charging of second degree murder in vehicular homicide cases]), and we note for purposes of any retrial that we believe there was sufficient evidence to convict defendant for second degree murder. *Watson* and its progeny have held that a pattern of reckless driving immediately prior to a fatal accident may be indicative of malice. (*Ibid; People* v. *McCarnes* (1986) 179 Cal.App.3d 525, 533 [224 Cal.Rptr. 846]; *People* v. *Albright* (1985) 173 Cal.App.3d 883, 887 [219 Cal.Rptr. 334]; *People* v. *Olivas, supra,* 172 Cal.App.3d at p. 989.) But "*Watson* deliberately declin[ed] to prescribe a formula for analysis of vehicular homicide cases" (*People* v. *Olivas, supra,* at p. 989), and we are not persuaded that a pattern of reckless driving is the sine qua non of vehicular murder.

We find substantial evidence of implied malice in defendant's case apart from his driving under the influence. There was evidence from which the jury could conclude that defendant was speeding at the time of the crash. The jury could also conclude that defendant had become intoxicated knowing he would have to drive. He had more drunk-driving convictions and at least as much exposure to alcohol treatment programs as the appellants in cases indicating that such histories are probative on the issue of malice. (*People* v. *Brogna* (1988) 202 Cal.App.3d 700, 706 [248 Cal.Rptr. 761] [one who has been convicted of driving under the influence knows better than most that such conduct creates a substantial risk of harm]; *People* v. *McCarnes, supra,* at p. 533.) We also find it very significant that one of the six prior convictions involved an accident that injured another driver.

Defendant maintains that it would have been "absurd" and "illogical" for him to think that his driving on the night in question was an act with "natural consequences . . . dangerous to life" or "a high probability [of] result[ing] in death" within the meaning of *Watson* because he drank and drove for 15 years without killing anyone. Such logic has no force whatsoever coming from someone whose drunk driving has already caused an injury accident. We do not regard a prior fatality to be any more of an absolute prerequisite to a finding of implied malice than a pattern of reckless driving.

Apart from substantial evidence, defendant's only other contentions involve alleged ineffective assistance of counsel. We need not reach those contentions because they relate solely to the murder conviction.

appreciated his tendency to drive and drive dangerously after drinking to excess.

 Having concluded that it was error not to instruct defendant's jury in accordance with CALJIC No. 4.21, we must also conclude that the error was prejudicial. The voluntary intoxication defense may well have been defendant's only hope of avoiding a murder conviction. No other instructions indicated that such a defense was available. Although defendant does not mention it, the error was compounded by another instruction given to the jury, contrary to *Watson,* that "a determination of malice depends upon an objective test." (See *People* v. *Watson, supra,* 30 Cal.3d at pp. 296-297 [determination of implied malice involves "a *subjective* standard"].) This inadvertent instruction must have further drawn the jury's attention away from defendant's mental state.

Drunk driving is a terrible social problem, and we have no sympathy whatsoever for this defendant. Our decision will hardly seem like justice to the family of Katrina LaMar. But it is our duty to apply the law as we discern it, and the present rule in this jurisdiction is that voluntary intoxication may negate the malice aforethought required for murder. We urge the Legislature to consider a different rule in implied malice cases that involve drunk driving.

### III. DISPOSITION

Defendant's conviction for second degree murder is reversed. The judgment of conviction is otherwise affirmed.

Anderson, P. J., and Channell, J., concurred.

Respondent's petition for review by the Supreme Court was denied October 11, 1990.