[No. A054103. First Dist., Div. Four. Sept. 29, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN LOUIS RICARDI, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of sections IIB through IIG.

**COUNSEL**

Fern M. Laethem, State Public Defender, under appointment by the Court of Appeal, and Kathleen M. Scheidel, Deputy State Public Defender, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, and Jeremy Friedlander, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**PERLEY, J.**—Steven Louis Ricardi was convicted by a jury in December 1988 of second degree drunk driving murder and other offenses arising from an accident on August 29, 1987, in which Ricardi's vehicle crossed the center divider of a highway and collided with a car driven by 15-year-old Katrina LaMar, who was killed in the accident. We reversed the murder conviction in *People* v. *Ricardi* (1990) 221 Cal.App.3d 249 [270 Cal.Rptr. 425], on the ground that Ricardi's defense had been prejudiced by the court's refusal to instruct the jury with CALJIC No. 4.21 (relevance of voluntary intoxication to specific intent). Ricardi has now been retried and convicted of second degree murder by a second jury. Ricardi challenges this conviction on various grounds, all of which lack merit. We affirm.

## I. FACTS

The testimony at trial covered: Ricardi's lengthy history of drunk driving; his participation in various alcohol treatment programs; the events of August 29, 1987; and the effects of alcohol intoxication generally.

Ricardi was convicted of driving under the influence of alcohol six times prior to the fatal accident in this case. These convictions occurred in 1973, 1974, 1979, 1981 and twice in 1986. California Highway Patrol officers testified to the circumstances surrounding the incidents that led to the convictions in 1979, 1981 and 1986. In three instances Ricardi was stopped because his car was weaving. The other arrest followed an accident in Riverside, California, in September of 1985. In that incident, a pickup truck was passing a tractor trailer on the left about 60 miles an hour. Ricardi drove up behind the pickup about 80 miles an hour and tried to pass it on the right, in front of the tractor trailer. In the process he clipped the back of the pickup, causing it to spin and flip, and injured the driver of the pickup.

Ricardi had been through several alcohol treatment programs before his arrest in this case. In 1980, after his third drunk driving offense, Ricardi became an outpatient at the Sunrise House alcohol and drug rehabilitation program. Later in 1980, after his fourth drunk driving offense, Ricardi completed a 90-day inpatient program at Sunrise House. The director of Sunrise House testified that by the end of the program, which includes six hours of class every day, a participant would "[a]bsolutely" understand the dangers of drinking and driving. A Sunrise House counselor reported to the probation department that Ricardi had raised his "awareness of all aspects [of] the disease of alcohol."

Following his sixth drunk driving offense, in the months preceding the accident herein, Ricardi participated for a second time in the Contra Costa

County Post Conviction Drinking Driver's Program. This program involves: 13½ hours of education; 43 hours of group therapy; half-hour sessions with an individual counselor twice a month; and 34 meetings of Alcoholics Anonymous. About half of the program is dedicated to teaching that it is dangerous to drink and drive.

As of April 1987, Ricardi had fallen behind in attendance at Alcoholics Anonymous meetings. He told his counselor that he was under stress, working long hours at two jobs to earn money to buy a house. The counselor observed that Ricardi was looking bloated and that his skin was yellowish, and she suspected that he might be drinking again. Ricardi told the counselor that he had been taking Antabuse, a drug that produces headache, vomiting and collapse when combined with alcohol. On May 27, Ricardi asked the counselor to supervise his taking of Antabuse. He received 50 tablets of prescription Antabuse on June 8. He passed a breath test in the program on August 24.

Ricardi arrived at the home of his friends, Judy and Robert Barrett, in Livermore around noon on August 29. The Barretts thought that Ricardi had just finished work welding on a 1 a.m. to noon shift. The Barretts kept a keg of beer in their garage. The keg was empty when Ricardi arrived, but a replacement keg was obtained at some point in the afternoon, along with a 12-pack of beer. Ricardi, Steven Barrett, the Barretts' daughters Phyllis and Lisa, and a friend were in the garage at various times, playing pool and talking. People in the garage were drinking out of the keg. Ricardi had an argument with Phyllis and left the house shortly thereafter, between 4:30 and 5:30 p.m., to go to his shop in Martinez.

Mr. Barrett, Mrs. Barrett and Phyllis testified that Ricardi did not appear to be drunk when he left the house. His speech was not slurred and he seemed like he was okay to drive. Ricardi did not testify at this trial. However, in rebuttal, the prosecution introduced Ricardi's testimony at the first trial that he had started to feel the effects of the alcohol he consumed at the Barretts before he began driving.

Shortly after 6 p.m., Katrina LaMar, who had a learner's permit, was driving with her mother, Emma LaMar, on Taylor Boulevard in Pleasant Hill. Douglas Harris was driving in the opposite direction on Taylor, behind Ricardi's pickup truck, and observed the truck drift to the left out of its lane toward the median in the center of the road. The pickup hit the median, hit a sign post in the middle of the median, crossed onto the other side of the road, and collided head on with the LaMars' car. Harris observed no attempt by Ricardi to break or swerve when he hit the median. Witnesses placed

Ricardi's vehicle at or near the speed limit at the time of the accident, and in closing argument the prosecution abandoned any claim that Ricardi was speeding.

Katrina LaMar died of head injuries as a result of the accident. Emma LaMar suffered severe injuries, including multiple fractures, collapsed lungs and a severed hand.

Blood samples taken from Ricardi about 7:30 p.m. showed a blood-alcohol level of .17 percent. Thus, according to the prosecution's expert toxicologist, Kevin Bush, Ricardi would have consumed 10½ 12-ounce beers if he had stopped drinking between 1:30 and 2 p.m., or 12½ beers if he had stopped between 4:30 and 5 p.m. Bush testified that a person's driving ability and judgment are both significantly impaired at a blood-alcohol level of .17 percent. Bush said that, at .17 percent, even an experienced drinker would feel the effects of alcohol, and notice that his motor skills were impaired. However, Bush could not say whether a blood-alcohol level of .17 percent would impair a person's ability to appreciate his level of impairment, or the risk associated with his actions.

Defense expert toxicologist Kenneth Marks said that at .17 percent a person would have difficulty appreciating his level of impairment. Marks testified that such a person might erroneously believe that his ability to drive safely was unaffected, and might have difficulty appreciating the dangers of driving. One of these dangers is that a person under the influence of alcohol is less alert. Marks noted that alcohol "actually makes a person go to sleep."

Marks cited several studies showing that people under the influence of alcohol become overconfident about their driving. In one such study, Canadian bus drivers were asked to maneuver between cones that were placed closer and closer together. Drivers who were intoxicated to the point of .10 percent or more erroneously felt that they could fit the bus through the smaller spaces. Marks said that, at an elevated blood-alcohol level, a person with an acquired tolerance to alcohol would be even less likely than a person without such tolerance to appreciate his impairment. However, a person with acquired tolerance to alcohol would be generally more aware of what was happening when he was intoxicated.

Marks could not say whether it was likely that, at .17 percent, someone with Ricardi's experience of convictions and education would be aware of the risks of driving. He could not predict whether overconfidence would negate awareness of the danger in those circumstances: "All we can say in general, is alcohol impairs the awareness. I would expect a person at .17 to

have impaired awareness, impaired judgment. So I would say that within the scope of what we know about alcohol, it's reasonably likely that that person may not be aware. But how their training and experience goes into that, I don't have a formula where I can plug that in or I can say '[i]t's approximately 47 percent probability.' It doesn't exist. I don't think that kind of study exists."

The jury deliberated over the course of approximately two full days before rendering its guilty verdict. The jury made several requests during the deliberations, including requests for testimony about Ricardi's arrest after the injury accident in Riverside,[1] and a request for a "definition of conscious/also definition of conscious in regards to malice/PLEASE."

Ricardi has been sentenced to a state prison term of 15 years to life for the second degree murder.

## II. DISCUSSION

### A. Instruction on Unconsciousness

█ Ricardi first contends that the judgment must be reversed because the jury was not instructed to consider that he may not have harbored malice aforethought because the killing occurred when he was unconscious due to voluntary intoxication. Ricardi submits that such an instruction was supported by the evidence suggesting that he was asleep at the wheel at the time of the collision, and that CALJIC No. 8.47 (5th ed. 1988) ("Involuntary Manslaughter—Killing While Unconscious Due To Voluntary Intoxication")[2] or its equivalent should have been given in light of that evidence. Defense counsel did not request such an instruction at trial. We conclude that the court had no duty to furnish such an instruction sua sponte, and that the instruction would have been inappropriate in this case in any event.

Ricardi argues that a court is required to instruct sua sponte on the effect of voluntary intoxication when it is relevant to the defendant's mental state. This argument is untenable under *People v. Saille* (1991) 54 Cal.3d 1103 [2

---

[1] The jury was evidently focusing on the testimony of the arresting officer that, when asked if he wanted a further test for his blood-alcohol level beyond the breath test he had received, Ricardi replied, " '[t]hat's fine. I have it now. I won't need another test[.]' "

[2] This instruction states: "If you find that a defendant, while unconscious as a result of voluntary intoxication, killed another human being without intent to kill and without malice aforethought, the crime is involuntary manslaughter. [¶] When a person voluntarily induces his own intoxication to the point of unconsciousness, he assumes the risk that while unconscious he will commit acts inherently dangerous to human life or safety. Under such circumstances, the law implies criminal negligence."

Cal.Rptr.2d 364, 820 P.2d 588]. All of the cases Ricardi cites involved crimes committed before abolition of the defense of diminished capacity. (*People* v. *Balderas* (1985) 41 Cal.3d 144, 196, fn. 24 [222 Cal.Rptr. 184, 711 P.2d 480]; *People* v. *Tidwell* (1970) 3 Cal.3d 82, 86-87 [89 Cal.Rptr. 58, 473 P.2d 762]; *People* v. *Graham* (1969) 71 Cal.2d 303, 316-317 [78 Cal.Rptr. 217, 455 P.2d 153].) *Saille*, however, held that abolition of the diminished capacity defense had eliminated the need for sua sponte instructions relating voluntary intoxication to a required mental state:

"[U]nder the law relating to mental capacity as it exists today, it makes more sense to place on the defendant the duty to request an instruction which relates the evidence of his intoxication to an element of a crime, such as premeditation and deliberation. This is so because the defendant's evidence of intoxication can no longer be proffered as a defense to a crime but rather is proffered in an attempt to raise a doubt on an element of a crime which the prosecution must prove beyond a reasonable doubt. In such a case the defendant is attempting to relate his evidence of intoxication to an element of the crime. Accordingly, he may seek a 'pinpoint' instruction that must be requested by him (citation), but such a pinpoint instruction does not involve a 'general principle of law' as that term is used in the cases that have imposed a sua sponte duty of instruction on the trial court. The court did not err, therefore, in failing to instruct sua sponte." (*People* v. *Saille, supra,* 54 Cal.3d at p. 1120.)

Ricardi contends, however, that the court had a duty to "correct" a related instruction requested by the defense. Ricardi requested the standard instruction on the defense of unconsciousness generally. (CALJIC No. 4.30 (5th ed. ·1988).) This instruction reads in pertinent part: "A person who commits what would otherwise be a criminal act, while unconscious, is not guilty of a crime. [¶] This rule of law applies to persons who are not conscious of acting but who perform acts while asleep . . . or because of . . . the involuntary consumption of intoxicating liquor . . . ." Ricardi notes that there was no evidence of *involuntary* intoxication in his case, and he does not maintain that the court erred in refusing to give this instruction. He speculates, however, that his counsel must have intended to secure an instruction on unconsciousness produced by *voluntary* intoxication. Defense counsel's closing argument referred to the evidence suggesting that Ricardi fell asleep just before the collision. Ricardi thus asserts that an instruction on unconsciousness from voluntary intoxication was required under the cases stating that a court " 'must correct defects in proffered instructions where the nature of the defendant's theory is made clear to it.' " (*People* v. *Bolden* (1990) 217 Cal.App.3d 1591, 1597 [266 Cal.Rptr. 724]; *People* v. *Brady* (1987) 190 Cal.App.3d 124, 136 [235 Cal.Rptr. 248].)

We do not believe that the court was required to guess what counsel had in mind in proposing CALJIC No. 4.30, or that it had a duty to fathom that counsel really meant to request CALJIC No. 8.47 or its equivalent. We find the defense theory to be less than "clear" under the circumstances and find no breach of duty on the part of the trial court. ■ We hold also that an instruction along the lines of CALJIC No. 8.47 would have been inappropriate in any event.

In the prior appeal, we reluctantly concluded in the light of controlling authority that Ricardi could argue that, because of voluntary intoxication, he may not have acted with the "conscious disregard for life" required for implied malice. (*People* v. *Watson* (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279].) It makes no more sense to us now than it did to us then to tell a jury that *getting* drunk in anticipation of driving may establish malice (*id.*, at pp. 300-301), but that *being* drunk when driving may negate malice. However, we were compelled to find that an instruction pursuant to CALJIC No. 4.21 was required to direct the jury to consider Ricardi's intoxication in determining whether he had the requisite mental state, and "*actually appreciated* the risk" associated with his actions. (30 Cal.3d at p. 297, original italics.)

As we stated, it follows that a jury must "decide whether all of the circumstances preceding a fatal accident caused by a drunk driver are sufficient to establish implied malice. Those circumstances will necessarily include both drinking, and driving while intoxicated, and the jury may appropriately focus on the accused's mental state at both points. The accused can point out that there would have been no murder unless he had proceeded to drive after drinking, and argue that he was too intoxicated when he took the wheel to actually appreciate the risks associated with his driving. The evidence in this case suggests that defendant was not too inebriated to know what he was doing when he set out on the highway. Instructing the jury to consider intoxication in connection with the accused's mental state does not preclude the prosecution from arguing, in an appropriate case and in accordance with *Watson*, that the jury may consider drinking in anticipation of driving as evidence of malice. . . . Such an argument would be appropriate in defendant's case, where the evidence suggests that he knew he would have to drive when he began drinking, and his past experience permits the inference that he actually appreciated his tendency to drive and drive dangerously after drinking to excess." (*People* v. *Ricardi, supra,* 221 Cal.App.3d at pp. 259-260, citation and footnote omitted; cf. *People* v. *Bennett* (1991) 54 Cal.3d 1032, 1039, fn. 5 [2 Cal.Rptr.2d 8, 819 P.2d 849] [gross vehicular manslaughter while intoxicated involves assessment of all relevant aspects of defendant's conduct having a "broad" causal connection with the fatal accident].)

Thus the mental element of this crime has to be measured over an extended period of time. In this case, that period extends from the time in the afternoon Ricardi decided to drink his first beer, through the time he proceeded to drink the next nine or eleven beers, through the point he decided to drive while intoxicated, through the hour or so he continued to drive under the influence, up to and including the point at which he evidently passed out on Taylor Road, and thereby caused the death of Katrina LaMar. Defense counsel was free to point out that Ricardi may have been asleep in the seconds before impact, for however much those seconds might have counted in the jury's mind. We think the jury was more likely to have focused on Ricardi's decision to drive. That was the point at which his experience and education became relevant, along with the defense expert's testimony that because of the level of intoxication, Ricardi might not have actually appreciated the risks of driving drunk, including the risk of drowsiness, despite all of his experience and education.

But contrary to Ricardi's claim on appeal, the jury did not need a separate instruction on unconsciousness to assess the evidence that he might have fallen asleep at the wheel. The jury would have known that this evidence militated in Ricardi's favor, however slightly, based on CALJIC No. 4.21's directive to consider his intoxication in determining whether he acted with implied malice, and another instruction that defined implied malice in terms of a "conscious" disregard for life. Thus, an unconsciousness instruction was unnecessary, and such an instruction would have been misleading because it would have placed an inordinate emphasis on Ricardi's mental state in the few seconds before the accident. The jury was instead properly instructed in the more general terms of CALJIC No. 4.21 to consider Ricardi's intoxication "at the time of the alleged crime," and it was correctly advised to consider his "state of mind that day both before and during the time he drove his vehicle in determining whether or not he acted with conscious disregard for human life." The court did not err in failing to instruct under CALJIC No. 8.47.

B.-G.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

---

## III.   Disposition

The judgment of conviction is affirmed.

Anderson, P. J., and Reardon, J., concurred.

A petition for a rehearing was denied October 29, 1992, and appellant's petition for review by the Supreme Court was denied December 31, 1992.