[No. B037972. Second Dist., Div. Five. Nov. 27, 1990.]

THE PEOPLE, Plaintiff and Appellant, v.
DANIEL EDMUND MURRAY, Defendant and Appellant.

**COUNSEL**

Laurance S. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney General, William T. Harter, Robert F. Katz and John R. Gorey, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

ASHBY, J.—While driving drunk going the wrong way on a freeway, appellant Daniel Edmund Murray killed four people in a head-on collision and injured two others. By jury trial appellant was convicted of four counts of second degree murder (Pen. Code, §§ 187, 189; *People* v. *Watson* (1981) 30 Cal.3d 290 [179 Cal.Rptr. 43, 637 P.2d 279]) and two counts of driving

under the influence causing injury. (Veh. Code, § 23153, subd. (a).) He was sentenced to state prison for a term of 30 years to life. We affirm.

FACTS

*Summary*

With a blood-alcohol level between .18 and .23 percent, appellant recklessly drove his pickup truck on the Ventura Freeway (101) near Calabasas and Agoura Hills the night of December 11, 1986. Traveling westbound at high speed and swerving all over the freeway, appellant barely avoided collisions with about 10 cars and the center divider. Appellant slowed to a stop in an exit lane, but apparently resumed driving on the freeway. Past the next exit he pulled over to the right shoulder of the freeway and stopped. He then made a *U-turn on the freeway* and began traveling the *wrong way*, eastbound on the westbound side of the freeway, at speeds of 55 to 80 miles per hour. Traveling against traffic, primarily in the emergency lane next to the center divider and the number one (fast) lane, appellant drove about four miles. Two persons were injured when appellant struck the side of one car and caused another car to swerve out of control. Appellant then struck head-on another car containing four persons, killing them all.

*Appellant's Prior Experience With Drinking and Driving*

Appellant, approximately 25 years old at the time of this accident, had been a regular drinker since age 17. In June 1979, he was convicted of driving under the influence; he was fined and ordered to attend traffic school, which he completed in September 1979. In October 1979, he was arrested again, convicted in December 1979 of driving under the influence, placed on probation, fined, and ordered to attend an approved drinking program.

In September 1983, appellant was convicted of alcohol-related reckless driving. He was sentenced to three days in jail and ordered to attend an alcohol program, which he completed in December 1983.

Appellant's 1983 alcohol program included four alcohol education classes, eight group sessions, six one-on-one meetings with a counselor, and attendance at six meetings of Alcoholics Anonymous. Patricia Shout was appellant's counselor in that program. During their interviews appellant told her that he was no longer driving after drinking because he did not want to repeat his experiences of court costs, jail time, and attendance at the program. He said he had learned a lot about alcoholism from the program.

Charles Lemke, a deputy sheriff, taught the alcohol education classes in appellant's 1983 traffic school. In his 10 hours of lessons, Lemke covered legal aspects of driving under the influence, historical and contemporary use of alcohol, and the long-term effects of alcohol on organs of the body. He taught that even small amounts of alcohol could impair the nervous system, the muscles, and the brain and lead to problems of judgment and lack of coordination. He taught that alcohol impairs the ability to make rational decisions and to judge distance and speed. He taught that alcohol reduces inhibitions and causes drivers to take abnormal chances, such as speeding and dodging in and out of traffic. He used films which demonstrated how driving performance declines as the blood-alcohol level increases, showed actual accidents involving drunk driving, and displayed the effect of alcohol on the brain. He used charts and curves demonstrating the number of drinks which average persons of different weights would require to reach prohibited blood-alcohol percentages, and he taught that beer has the same effects as liquor and wine.

Expert testimony at trial indicated that regular drinkers with a high tolerance for alcohol can continue to function without appearing to be out of control, at blood-alcohol percentages which would cause average persons to have obvious difficulties with gross motor coordination, balance, slurred speech, passing out or throwing up. Alcohol-tolerant persons could have a blood-alcohol percentage of .19 to .23 or even higher and still be aware of events and of the dangers caused by their behavior. Although they could still function, such persons would suffer impairment of driving abilities such as processing stimuli, reasoning, depth perception, visual acuity and reaction time.

In 1986, appellant lived in Lancaster and was employed as a crane operator by Northrop Corporation in Hawthorne. Appellant's friends and co-workers, Charles Scott and Richard Fordiani, testified to observing appellant drink three to five beers at lunch and operate his crane after lunch without apparent problems. If they went drinking together after work it was not unusual for appellant to drink 12 beers. Sometimes they would go after work to a place called "Beer Country" where during "happy hour" beer was 50 cents a pitcher. A pitcher contained the equivalent of four or five 12-ounce cans of beer and it was not unusual for their group of four or five persons to drink fifteen to twenty pitchers.

After work on Friday, October 10, 1986, just two months before the instant fatal accident, appellant, Fordiani, and two others went to Beer Country and shared pitchers of beers. Appellant did not appear to have any trouble when Fordiani observed appellant drive away from the bar. When appellant next saw Scott and Fordiani at work, however, appellant told

them that after he started home he blacked out; he woke up in his car with the lights on and motor running, on the shoulder on the wrong side of Malibu Canyon Road, and he had no idea how he got there. Appellant was "real concerned" about this incident and said he had to "knock this stuff off." Appellant told Fordiani that he was not going to drive to work anymore, he was going to join a van pool. Thereafter appellant did in fact join a van pool.

*Appellant's Drinking on December 11, 1986*

A party was planned for certain Northrop employees to thank them for participating in a charity project. The party was to take place at the close of appellant's shift on the afternoon of December 11, 1986, at the Northrop Recreation Center. It was common knowledge that free beer would be served.

Appellant had begun using a van pool, which ordinarily left immediately after work. He decided, however, to drive his pickup truck to work December 11 so he could attend the party and, after the party, go with Richard Fordiani to a Christmas tree lot to pick up a Christmas tree to take home. Appellant knew beer was going to be served and he planned to drink.

On his lunch break that day appellant had three beers. His shift ended at 2:42 p.m., and he took a five-minute walk to the recreation center. The party lasted 2 hours and by his own admission appellant had 10 to 12 beers. Appellant left the party about 5 p.m. Appellant had no problems as he drove away in his pickup truck with his friend Fordiani. Appellant drove about a mile, stopped at a convenience store, and bought a 12-pack of beer.

Appellant then drove 11 to 12 miles to Lomita to a Christmas tree lot operated by Fordiani's brother-in-law, arriving about 6 p.m. Appellant and Fordiani each had two beers on the way. While Fordiani assisted his brother-in-law, appellant walked around the tree lot picking a tree and drinking three to five beers. Fordiani helped load a tree onto appellant's truck. Fordiani suggested they get some coffee but appellant declined, indicating he was in a hurry to get home. Appellant had another beer just before he left the tree lot around 7:15. There were two or three more beers in the truck. Appellant asked directions to the freeway and Fordiani told him to go back the same way they had come. Appellant entered his truck and drove away alone.

At 9:42 p.m. appellant stopped at a Burger King at 5109 Van Nuys Boulevard just off the Ventura Freeway and purchased a cheeseburger, french fries and a chocolate milk shake. Appellant had an argument with

the clerk about the prices. Although the clerk believed appellant to be intoxicated, appellant did not stumble, stagger or slur his speech.

In order to go home to Lancaster from the Ventura Freeway near the Burger King, appellant should have taken the San Diego Freeway (405) north. Instead, he remained westbound on the Ventura Freeway far past its intersection with the San Diego Freeway.

### Westbound on the Ventura Freeway[1]

As appellant continued westbound on the Ventura Freeway, numerous witnesses observed his reckless driving.[2] At speeds up to 80 miles per hour, appellant passed numerous vehicles barely avoiding collisions with them and with the center divider. He moved back and forth across all traffic lanes from the shoulder on the right to the center divider on the left. At Chesebro Road, however, where the right freeway lane becomes the exit lane, appellant slowed, then came to a complete stop. Another vehicle had to swerve to avoid hitting appellant.

### U-turn and Wrong-way Driving

Appellant apparently failed to exit at Chesebro, because appellant's truck was next seen stopped on the shoulder past Kanan Road. Suddenly appellant turned across all of the freeway lanes. Appellant completed a U-turn and began driving eastbound, the wrong way, in the westbound emergency lane next to the center divider.

Numerous westbound motorists were forced to change lanes to avoid appellant's wrong-way driving in the emergency and number one lanes. John Mahnkan had a closer call. He was in the number one lane when he observed headlights approaching him in the emergency lane. Unable to move to the right because of other traffic, Mahnkan remained in the number one lane, and appellant passed by in the emergency lane, inches away from Mahnkan. Mahnkan could see appellant's face, which had a stern, angry, straightforward expression. "It was an angry look, it was a look just like he was trying—trying to strangle, or, you know, if you've seen a person where he was going to strangle something, it was just straightforward, and it was like it was determined, he was out for something." Appellant was sitting erect with his hands on the steering wheel in the 10 o'clock and 2 o'clock positions.

---

[1] The pertinent freeway exits are in the following order, from east to west: Liberty Canyon, Chesebro, Kanan.

[2] From the Burger King on Van Nuys Boulevard to the point of collision, taking into account appellant's U-turn, was a total distance of 24 miles.

Craig Konjoyan, traveling in the number four lane, described appellant's driving as jerky; Konjoyan repeatedly heard the sound of the accelerator being "floored and released, floored and released." Martin Weber, traveling in the number two lane, observed appellant intensely leaning forward over the steering wheel.

One witness observed events from the eastbound side of the freeway. Catherine Studnicka was traveling in the fast lane of the eastbound freeway near Kanan Road. She was startled to observe appellant's vehicle going the same direction as she but on the other side of the center divider. She honked her horn repeatedly for 10 to 15 seconds and finally appellant looked toward her for 3 or 4 seconds. Appellant then turned his head back in the direction he was traveling and sped up. As appellant sped or slowed, Studnicka kept pace with him, continuing to honk. Between Chesebro and Liberty Canyon, appellant looked briefly in her direction again, then slowed to 55, sped to 75, and slowed back to 65 or 70. Appellant was sitting straight with his hands in the 10 o'clock and 2 o'clock positions.

After they passed Liberty Canyon, Studnicka saw sparks; appellant's truck collided with another vehicle, flew into the air and fell, then Studnicka heard the sound of another collision. She noted the time; it was 10:10 p.m.

*The Collisions*

Patricia Matheus was driving a Mazda in the number one westbound lane when she saw two headlights coming directly at her. She swerved, but appellant's truck hit a glancing blow to the side of her car then struck it again as the Mazda spun. She received injuries which were not permanent.

William Van Laningham, also traveling westbound in the number one lane, saw the approaching headlights and swerved to avoid a collision. His car went into a slide and rolled off the freeway. He received injuries which were not permanent.

Susan Brown, Jack Rauls, Tia Brown, and Jona Brown were traveling in a Honda Accord in the number one westbound lane.[3] Appellant hit the Accord head on. Sidney Hoffman was traveling behind the Accord. He observed spinning lights and scattering glass at the moment of the collision. The Accord "suddenly stopped" then bounced 90 degrees to the right.

---

[3] They were on their way home after watching Jamaal Brown play in a basketball game at Beverly Hills High School. Returning home on the team bus, Jamaal Brown witnessed the aftermath of the collision and recognized his mother's car. Jamaal was the son of Susan Brown, grandson of Jack Rauls, brother of Jona Brown, and boyfriend of Tia Brown.

Susan Brown, Jack Rauls, and Tia Brown were pronounced dead at the scene. Jona Brown was transported to a hospital in critical condition and died less than one hour later. The cause of death for each was multiple traumatic injuries from the automobile collision.

*Appellant's Condition After the Collision*

Appellant was relatively uninjured in the accident. He did not stagger or fumble while producing identification. He responded to questions from paramedics and a highway patrol officer, but he was not sure how the accident happened.

A highway patrol officer examined appellant thereafter at Westlake Community Hospital and concluded appellant was under the influence. Appellant had a strong odor of alcohol on his breath, his eyes were bloodshot and watery, and appellant exhibited nystagmus, a jerky bouncing motion of the eyes.

Blood samples were taken from appellant at 11:20 p.m. and 12:30 a.m. The first measure was .19 percent blood alcohol and the later measure was .15 percent. The prosecution criminalist estimated that appellant's blood-alcohol level at 10:10 p.m., the time of the collision, was between .18 and .20 percent. He estimated that appellant drank 12 to 14 beers. The defense criminalist estimated that appellant's blood alcohol at the time of the accident was .22 or .23 percent. He estimated this represented 14 to 18 beers.

A highway patrol officer transported appellant from the hospital to jail about 1:40 a.m. Appellant responded without difficulty to all questions on the booking form, including his employment, address, and family members. Appellant was agitated and belligerent, asking when he could get out of jail.

*Defense*

Appellant's defense to the murder charges was that at the time of the accident he lacked an actual awareness of the risks created by his conduct.

Appellant testified at trial that he remembered nothing from the moment he left the Christmas tree lot in Lomita until after the accident. When he got out of his truck, he observed that it was smashed up, and he figured he must have hit the center divider. He did not learn until the next day that anyone else was involved.

In May 1974, when appellant was 13, he was struck on the side of the head at a baseball game by a flying piece of a baseball bat. He was

unconscious for the five minutes it took his parents to transport him to a hospital emergency room. He was released from the hospital the same day and, so far as he and his parents knew, no problems requiring medical attention developed thereafter from this injury.

Shortly before trial, on April 22, 1988, Dr. Marvin Ziporyn, a physician and surgeon specializing in psychiatry, conducted a two-hour examination of appellant at jail. Dr. Ziporyn formed an opinion that as a result of the baseball bat injury when appellant was 13 years old, appellant suffered from a mental disorder, organic brain syndrome. This particular brain disorder is exacerbated by alcohol. In Dr. Ziporyn's opinion occasional blackouts, such as appellant's Malibu Canyon Road incident, are consistent with brain damage leading to overreaction or hypersensitivity to alcohol or amphetamines.[4]

In Dr. Ziporyn's opinion, a person with organic brain syndrome, a .21 percent blood-alcohol level and a small amount of amphetamine would not be aware of the consequences of his actions or of the risks to others. Such a person could, however, in Dr. Ziporyn's opinion, function robot-like and could drive 25 miles on a freeway avoiding other vehicles and obstacles as a "conditioned reflex."

## CONTENTIONS

Appellant raises contentions concerning the admission of evidence, the sufficiency of evidence of implied malice, and the sentence. Finding no merit to these contentions, we affirm.

## ADMISSION OF EVIDENCE

### Prior Convictions and Alcohol Education Programs

■ The trial court properly admitted evidence that in connection with appellant's three prior convictions of drunk driving and alcohol-related reckless driving, appellant completed mandatory education programs on the dangers of drunk driving. The trial court's ruling is amply supported by *People* v. *McCarnes* (1986) 179 Cal.App.3d 525, 532 [224 Cal.Rptr. 846] and *People* v. *Brogna* (1988) 202 Cal.App.3d 700, 708-710 [248 Cal.Rptr. 761], which held such evidence is relevant to show the accused's awareness of the life-threatening risks of drunk driving.

---

[4] The samples of appellant's blood taken on the night of the accident also contained trace amounts of amphetamine and methamphetamine. Appellant indicated that two nights before the accident he had taken amphetamine.

Appellant contends, "it does not necessarily follow that someone who sits through a mandatory course has attained a subjective awareness" of the course material. Such certainty is not required; the jury was entitled to draw a reasonable inference that appellant gained awareness through the experience. (Evid. Code, § 210.) The argument that such evidence has no probative value was rejected in *McCarnes* and *Brogna*. The evidence in this case was even stronger than *McCarnes* and *Brogna* because it included admissions made by appellant during his 1983 alcohol education classes that he had learned a lot from his experience and the program.

There is no merit to appellant's contention that the testimony of the traffic school instructors constituted "opinion testimony that appellant gained a subjective awareness of the life perils of drunk driving by having attended their class." The instructors did not give opinion testimony; they merely described the course content and appellant's admissions. (Cf. Evid. Code, § 800.)

*Malibu Canyon Road Incident*

■ The trial court properly admitted evidence of appellant's statements to friends that two months before the accident he found himself in his car on Malibu Canyon Road with no idea how he got there. There is no merit to appellant's contention that the Malibu Canyon Road incident was improper character evidence showing an evil "propensity to go driving about like a Zombie." (Cf. Evid. Code, § 1101.) The evidence was probative to show appellant's awareness that he could black out while driving after drinking. This was highly relevant to the mental state required for a conviction of second degree murder under *People* v. *Watson, supra,* 30 Cal.3d 290, and was admitted for that purpose under limiting instructions. The Malibu Canyon Road incident, occurring only two months before the accident, brought home to appellant's mind the dangers of drunk driving, even more vividly than alcohol education classes. (Cf. *People* v. *McCarnes, supra,* 179 Cal.App.3d at p. 532.) Appellant was so concerned about it that he stopped driving to work and joined a van pool.

SUFFICIENCY OF EVIDENCE

■ In *People* v. *Watson, supra,* 30 Cal.3d 290, the Supreme Court held that in appropriate circumstances homicide caused by a drunk driver may be prosecuted as second degree murder rather than vehicular manslaughter with gross negligence. Implied malice for second degree murder is shown when a person does an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that the conduct endangers the life of another and who acts with conscious

disregard for life. (*Id.* at pp. 296, 300.) Unlike gross negligence which is determined by an objective standard of a reasonable person, implied malice requires a determination that the accused actually appreciated the risk involved. (*Id.* at pp. 296-297.) A later case stated in more everyday language that the state of mind for implied malice is " 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.' " (*People v. Olivas* (1985) 172 Cal.App.3d 984, 988 [218 Cal.Rptr. 567].)

■ Since *Watson*, three cases have upheld murder convictions for deaths caused by driving under the influence. (*People v. Olivas, supra*, 172 Cal.App.3d 984; *People v. Albright* (1985) 173 Cal.App.3d 883 [219 Cal.Rptr. 334]; *People v. McCarnes, supra*, 179 Cal.App.3d 525.)[5] Contrary to appellant's contentions, the combination of factors in this case even more strongly supports the jury's finding of implied malice.

Like *McCarnes, supra*, 179 Cal.App.3d at page 532, appellant had repeated experiences of drunk driving convictions and repeated exposures to mandatory educational programs, from which the jury could infer that appellant became aware that drunk driving is dangerous to life. Even more strongly here, this lesson was brought home to appellant only two months before this killing, when appellant found himself on Malibu Canyon Road with no idea how he got there.

On the fateful day, however, appellant deliberately chose to drive his truck to work so that he could attend the drinking party after work. He deliberately chose to drink and drive, knowing that after the party he would have to drive a long distance home from Hawthorne to Lancaster. This is like *Watson, supra*, 30 Cal.3d at page 300, where the defendant drove his car to a bar and "must have known that he would have to drive it later."

Appellant drank so much beer that his blood-alcohol level, estimated between .18 and .23 percent, was far higher than the legal limit at which intoxication is presumed. (*People v. Watson, supra*, 30 Cal.3d at pp. 294, 300 [.23 percent blood alcohol]; *People v. Albright, supra*, 173 Cal.App.3d at p. 885 [.17 percent blood alcohol]; *People v. McCarnes, supra*, 179 Cal.App.3d at p. 528 [.27 percent blood alcohol].)

Appellant claims this case contrasts with *Olivas, supra*, 172 Cal.App.3d at page 989, where the defendant struck another car before the fatal

---

[5] Another recent drunk driving case reversed a murder conviction for instructional error, and commented only briefly that the evidence was sufficient to establish malice. (*People v. Ricardi* (1990) 221 Cal.App.3d 249, 260, fn. 5 [270 Cal.Rptr. 425] [pattern of reckless driving immediately prior to fatal accident; speeding at time of crash; defendant became intoxicated knowing he would have to drive; defendant had six prior drunk driving convictions, including one causing injury, and participated in alcohol rehabilitation programs].) The instructional error which required reversal in *Ricardi* did not occur in this case.

collision and with *People* v. *Watson, supra*, 30 Cal.3d at page 301, where the defendant nearly collided with another vehicle and skidded to a stop before resuming driving. Appellant contends there were no such preliminary collisions here to make appellant aware of his dangerous driving. The evidence here was nevertheless sufficient. In *People* v. *McCarnes, supra*, 179 Cal.App.3d at pages 533, 535, there was no preliminary collision but the court held the defendant's awareness was shown by the defendant's pattern of reckless high-speed passing maneuvers on two-lane roads and traveling on the dirt shoulder. In *People* v. *Albright, supra*, 173 Cal.App.3d at page 887, the defendant merely passed three cars, but the court held this showed he "knew other people were on the road." Here, appellant had numerous near misses with other automobiles and the concrete center divider. The absence of specific evidence that appellant braked to avoid any of these near collisions does not necessarily indicate appellant was unaware of them. It shows only that appellant was able to avoid them by steering or changing acceleration. Furthermore, like the defendant in *Watson* who came to a temporary stop before resuming speed, appellant came to a complete temporary stop on the side of the freeway before making a U-turn and driving the wrong way for several miles.

Appellant contends that no person would knowingly and intentionally drive the wrong way on the freeway, therefore appellant must not have been aware of the risk. The jury was entitled to infer otherwise. In *People* v. *McCarnes, supra*, 179 Cal.App.3d at pages 528, 533, 535, the defendant had a head-on collision during a passing maneuver on a two-lane road. The court stated, "Defendant's conduct was even more egregious because the oncoming vehicle he collided with was clearly visible to defendant as he entered the opposing lane." (*Id.* at p. 535.) Here the driving occurred at night and the jury could infer that appellant must have known from headlights coming toward him that he was going the wrong way. In addition, the witness Studnicka was traveling parallel with appellant, eastbound on the eastbound side of the freeway, opposite the center divider from appellant. She repeatedly tried to attract appellant's attention and eventually succeeded, for appellant looked at her twice.

The pattern of appellant's driving further supported a jury inference that he knew he was going the wrong way, was aware of the danger to human lives, and deliberately proceeded in conscious disregard of that risk. When previously going westbound in the westbound lanes, appellant drove all over the freeway, from the right side to the center divider. After his U-turn he remained primarily in the emergency lane next to the center divider. The jury might infer appellant thought he could keep going if he stayed in the emergency lane and that he deliberately chose to continue in conscious disregard of the risk to human lives. The jury might also conclude appellant

consciously disregarded the risk because he was angry and frustrated over missing his turn for Lancaster.[6]

■ Finally, appellant contends, "What differentiates this case from all others of its genre is uncontradicted substantial evidence that appellant unknowingly suffered from an organic brain syndrome which would tend to (unwittingly) magnify the effect of intoxicants on his system." The jury was not bound to accept the opinion of appellant's medical expert. Jurors should give expert opinion only the weight to which they find it to be entitled, and may disregard expert opinion found by them to be unreasonable. (Pen. Code, § 1127b; *People v. Wolff* (1964) 61 Cal.2d 795, 804 [40 Cal.Rptr. 271, 394 P.2d 959].) In this case the jury had ample grounds to reject as unreasonable the opinion of appellant's expert, Dr. Ziporyn. *(People v. Drew* (1978) 22 Cal.3d 333, 350 [149 Cal.Rptr. 275, 583 P.2d 1318].) There was no persuasive evidence of brain damage. The original baseball bat injury occurred in 1974 when appellant was 13. Although appellant was knocked unconscious, he was released from the hospital emergency room the same day. So far as he and his parents were concerned, no problems developed during the next 12 years which caused him to need or to seek additional medical attention for that injury. Although Dr. Ziporyn opined that any period of unconsciousness from a head injury necessarily involves a concussion and permanent brain damage, he admitted such damage could be extremely minor. Dr. Ziporyn conducted no physical tests for brain damage such as an EEG or a CAT scan; he merely observed appellant during their single two-hour interview. Appellant performed adequately on almost all aspects of the interview except some subtraction calculations. Furthermore, even assuming the alleged brain injury magnified the effects of alcohol, appellant knew from many years' subsequent experience, three alcohol-related convictions, mandatory alcohol education programs and his Malibu Canyon Road incident, of the effects of alcohol on his driving.

Dr. Ziporyn admitted that he was unfamiliar with the details and pattern of appellant's driving before the accident. *(People v. Drew, supra,* 22 Cal.3d

---

[6]The prosecutor argued to the jury: "He says, 'Who would drive the wrong way on the freeway?' [¶] Well, how about somebody who was angry? [¶] . . . [T]ake a look at all the evidence . . . . [W]hen he was going to the driving under the influence school, he himself made statements that said he gets into fights sometimes when he was drinking. Fordiani says he got ornery when he drinks. We know that night he got into an argument with some clerk at a Burger King . . . . He missed an exit. First he stops at Chesebro . . . he was looking to see a way to get off. He stops there, can't see it. He goes on. He misses the next exit and he gets angry and frustrated because he's been drinking, because he's belligerent, and he makes the U-turn. And Craig Konjoian [sic] says he sees him flooring and release, floor and release, floor and release the way somebody does when they're angry. [¶] Martin Webb, the minister, said that he was intensely leaning over the steering wheel. Mahnkan said he was stern, fixed, determined as if he were going to strangle somebody."

at p. 350.) The jury could reject as unreasonable Dr. Ziporyn's opinion that appellant could drive more than 20 miles from the Burger King, have numerous near misses with other vehicles and the center divider, stop and make a U-turn, and drive 4 miles the wrong way against traffic, all in a robot-like or reflexive manner without being aware of the risks to human life involved.

As discussed in *People* v. *Olivas, supra,* 172 Cal.App.3d at page 989, the application of *Watson*'s standards for distinguishing second degree murder from vehicular manslaughter with gross negligence is a case-by-case process. The evidence in this case supports the jury verdicts of second degree murder.

## CONSECUTIVE SENTENCES

■ The trial court sentenced appellant to consecutive terms on two of the murder counts and to concurrent terms on all the remaining counts. The result was a prison term of 30 years to life. (Pen. Code, § 190, subd. (a).)

Appellant contends he committed only a single act of colliding with the homicide victims' vehicle while driving drunk, and that the number of victims in the car is unrelated to his culpability. He contends that in sentencing consecutively the trial court should not have relied in part on the stated reason that "defendant should serve a longer sentence than he would serve if he were only charged with one count of second-degree murder." There is no merit to appellant's contention. Multiple punishment is proper when a single act of violence, including drunk driving, injures or kills multiple victims. (*People* v. *McFarland* (1989) 47 Cal.3d 798, 803 [254 Cal.Rptr. 331, 765 P.2d 493].) "A defendant who commits an act of violence . . . by a means likely to cause harm to several persons is more culpable than a defendant who harms only one person. For example, a defendant who chooses a means of murder that places a planeload of passengers in danger, or results in injury to many persons, is properly subject to greater punishment than a defendant who chooses a means that harms only a single person." (*Neal* v. *State of California* (1960) 55 Cal.2d 11, 20 [9 Cal.Rptr. 607, 357 P.2d 839].)

■ Appellant contends this case does not fit rule 425(a)(4), California Rules of Court, which states the aggravating factor that "any of the crimes involved multiple victims." This rule has been interpreted to be inapplicable when there are multiple counts each having only a single victim. (*People* v. *Humphrey* (1982) 138 Cal.App.3d 881, 882 [188 Cal.Rptr. 473].) Another line of cases, however, states this factor may properly be invoked when

multiple counts each involving a single victim are transactionally related to each other. (*People* v. *Guevara* (1979) 88 Cal.App.3d 86, 93 [151 Cal.Rptr. 511]; *People* v. *Birmingham* (1990) 217 Cal.App.3d 180, 185 [265 Cal.Rptr. 780].) This is because the "circumstances" of a crime which the trial court may consider in aggravation or mitigation include all of the "attendant facts" or "surroundings." (*People* v. *Guevara, supra.*) Here the multiple deaths involved in the murder counts are transactionally related, all arising from the same collision.

In any event, California Rules of Court, rule 425(a)(4) does not govern the instant sentence. The specific sentencing rules apply only to offenses punishable by a determinate sentence imposed pursuant to Penal Code section 1170 et seq. (Rule 403, Cal. Rules of Court; *People* v. *Arviso* (1988) 201 Cal.App.3d 1055, 1058 [247 Cal.Rptr. 559].) Here the trial court sentenced consecutively on two *in*determinate terms of fifteen years to life pursuant to Penal Code sections 1168 and 190, subdivision (a). The sentencing rules do not apply and the trial court had full discretion to impose consecutive sentences under the indeterminate sentencing law. (*People* v. *Arviso, supra*, 201 Cal.App.3d at pp. 1058-1059.) The trial court's sentence in this case was carefully considered, supported by numerous reasons, and well within the trial court's discretion. (*Id.* at pp. 1059-1060.)

The judgment is affirmed.

Lucas, P. J., and Boren, J., concurred.

The petition of appellant Murray for review by the Supreme Court was denied February 20, 1991.