Filed 6/5/20

# CERTIFIED FOR PARTIAL PUBLICATION[*]

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

THE PEOPLE,

     Plaintiff and Respondent,

v.

MICHAEL GEORGE BETTASSO,

     Defendant and Appellant.

E072173

(Super.Ct.No. INF1600885)

OPINION

APPEAL from the Superior Court of Riverside County. Timothy J. Hollenhorst, Judge. Affirmed.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Attorney General, Julie L. Garland, Assistant Attorney General, Daniel Rogers, Sharon L. Rhodes and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part A. of the DISCUSSION.

1

A jury convicted Michael Bettasso of driving under the influence (DUI) of alcohol causing injury, hit and run driving causing death, driving with a suspended license, and second degree implied malice murder. (Pen. Code,[1] §§ 187, subd. (a), 189, subd. (b); Veh. Code, §§ 14601.2, 20001, subd. (a), 23153, subd. (a).) The jury also found true a great bodily injury enhancement associated with the DUI count. (§§ 12022.7, subd. (a), 1192.7, subd. (c)(8).) Bettasso was sentenced to a total term of 19 years to life.

On appeal, Bettasso challenges the sufficiency of the evidence supporting the second degree murder conviction and also contends that the trial court prejudicially erred by failing to instruct the injury on vehicular manslaughter as a lesser included offense of murder. In the published portion of our opinion, we hold that vehicular manslaughter is not a lesser included offense of murder. (*People v. Wolfe* (2018) 20 Cal.App.5th 673, 685-686 (*Wolfe*).) In the unpublished portion, we reject Bettasso's substantial evidence challenge, and we accordingly affirm the judgment.

## BACKGROUND

A. *Bettasso's Workday Before the Collision*

On July 2, 2016, Bettasso was working as a bartender along with Julie M., another bartender with over 30 years' experience. They both worked from 1:00 p.m. to 7:00 p.m. Early in the shift, Julie made herself and Bettasso each a mixed drink consisting of vodka and cranberry juice, which they both drank. Over the remainder of the shift, Julie estimated that Bettasso drank an additional three drinks. Julie did not know whether

---

[1] Further unlabeled statutory references are to the Penal Code.

Bettasso's remaining drinks contained alcohol.  She did not see him pour them.  She also explained that bartenders sometimes pretend to drink alcohol to appease customers.  Bartenders sometimes pour themselves a nonalcoholic drink.

Two surveillance video recordings (without audio) totaling approximately 55 minutes taken from different angles inside of the bar during Bettasso's shift were played for the jury.[2]  Bettasso finished the drink mixed by Julie at 1:21 p.m.  During the remainder of his shift, Bettasso drank an additional six mixed drinks, including four between 1:21 p.m. and 3:05 p.m., one at 4:16 p.m., and one at 6:06 p.m.  Bettasso also drank five total shots at 3:49 p.m., 4:53 p.m., 5:39 p.m., 5:55 p.m., and 6:34 p.m.  For two of those shots (at 4:53 p.m. and 5:39 p.m.), Bettasso poured himself a shot from the same bottle that he poured a shot for a customer and drank the shots with those customers.

By the end of Julie's and Bettasso's shift, Julie thought that Bettasso was intoxicated.  Bettasso's speech was slurred.  He also appeared to be stressed and distracted.  Julie thought that Bettasso should not drive, and she expressed that concern to him.  She told him that he looked stressed, so he should stay with mutual friends locally.  Bettasso responded, "'I'm fine.'"  Julie also shared her concern about Bettasso driving with T.R., another coworker.

T.R. arrived at the bar at 6:45 p.m. that night.  He almost immediately interacted with Bettasso and was concerned that Bettasso seemed "inebriated."  T.R. saw Bettasso stumble, tripping over either his own feet or a chair that Bettasso was moving.  T.R. had

---

[2]    The parties agreed that the recording was "edited to include relevant portions of the video."

known Bettasso since childhood and drank with him many times. T.R. told Bettasso that he seemed inebriated and told Bettasso that he should not drive. At approximately 7:00 p.m., T.R. told Bettasso, "'You are an asshole if you decide to drive.'" Bettasso responded, "'I'm fine.'"

B. *Post-Collision Witnesses*

At approximately 7:45 or 8:00 p.m., a husband and wife were driving southbound on North Indian Canyon Road. The husband, who was driving, noticed a small grey or silver Nissan on the side of the road with some damage to the hood and extensive impact damage to an unspecified window. It was still light outside. The husband slowed down to approximately 20 miles per hour and saw a person whom he later identified as Bettasso walking around outside of the car looking panicked and distraught. Because of the impact to the window, the husband thought that something might have been ejected from the car, but he looked around and did not see anything. Fifty or 60 yards ahead of the Nissan on the other side of the road there was an old camper truck with its hood open. The husband and wife proceeded to dinner. The parties stipulated that the wife would testify similarly to her husband about what she saw that night and that she identified Bettasso in a photographic lineup as the person whom they saw.

About 10 minutes later, at 8:10 p.m., an Uber driver driving along North Indian Canyon Road noticed a white pickup truck with a camper and a small car off the road some distance ahead. It was light outside. After the Uber driver passed the small car, he noticed in the rear view mirror that the car was damaged, so the driver turned around.

4

The windshield appeared "caved in." The Uber driver asked the person standing near the driver's door if he needed help. Bettasso said that someone was on the way, so the Uber driver continued driving his passengers to their destination. Because of the damage to the car, the Uber driver thought that the car had collided with a bicycle or a person. The Uber driver returned to the location when he was alone and took several pictures of the damaged car. He contacted law enforcement the next day.

C. *Bettasso's Post-Collision In-Person Encounters and Towing of the Vehicle*

At around 9:00 p.m., Bettasso called his stepdaughter and told her that he had been drinking and that he had hit something with his car, possibly a coyote or a dog. Her biological father picked up Bettasso. The stepdaughter saw Bettasso about one hour later, and she later told law enforcement that he appeared drunk and "freaked out."[3]

Shortly after midnight, Bettasso called his mother, told her that he had been in a car accident, and asked her to take him to his car. She picked him up and drove him there. Bettasso told her that he thought he had hit a large dog or an animal. She looked around the car, underneath it, and in the field with a flashlight but did not see anything. She noticed the white truck on the other side of the road. She called for a tow truck. Later in the evening on the day after the collision, Bettasso's mother spoke with a police

---

[3] At trial, the stepdaughter contradicted her statement to law enforcement and testified that Bettasso did not appear drunk when she saw him that night.

officer and told him that she smelled alcohol on Bettasso's breath and that she thought her son should not have been driving the night before.[4]

When the tow truck driver arrived, Bettasso told the driver that his mom had been driving and hit a coyote. The tow truck driver did not speak with Bettasso's mother. The driver did not see anything around the car or notice any blood on Bettasso's car. The driver loaded Bettasso's car onto the flatbed, and Bettasso rode in the cab of the truck with the driver for approximately 30 minutes. The driver smelled alcohol on Bettasso's breath and noticed that Bettasso was slurring slightly, so he thought that Bettasso was intoxicated.

D. *Discovery of the Body and Subsequent Investigation*

The next morning two bicyclists travelling on North Indian Canyon Road came upon a body lying on the side of the road and called 911. The victim had died from multiple blunt force injuries that were consistent with being hit by a car.

A law enforcement officer investigated the area around where the body was discovered and concluded that a vehicle had veered off the road and struck the victim. The street had an asphalt shoulder followed by a dirt shoulder, a raised dirt berm, and the desert. The body was located in the dirt shoulder between the asphalt and the dirt berm. The bicyclists thought that the body was approximately 20 feet from the side of the road.

---

**4**    At trial, Bettasso's mother denied having made those statements to the officer. She claimed to instead have made a general statement about people not driving when they drink and to have said that she smelled alcohol on Bettasso's person from alcohol having spilled onto him during work at the bar.

Some distance in front of the pickup truck that had the hood open, the officer found one of the victim's shoes, as well as furrow marks in the dirt shoulder. The victim's other shoe also was found near the body and not on the victim's foot. There also were broken plastic pieces on the raised dirt berm, which appeared to be from a car's blinker light. One of the plastic pieces bore the word "Nissan."

The investigating officer believed that the body was found 100 feet from the initial point of impact. From dirt furrow marks and tire pressure marks, the investigator concluded that the car returned to the asphalt shoulder and came to an "abrupt stop" approximately 120 feet past the body and approximately 400 feet past where the car initially veered off the road. The investigator opined that the driver was traveling at a normal rate of speed. The speed limit was 55 miles per hour.

Later that night, an officer went to Bettasso's residence and found Bettasso's grey Nissan Sentra in the driveway. The car was damaged on the passenger side on the front bumper, the hood, the windshield, and the side mirror. There was "hair and/or blood with some matter attached to the windshield."

E. *Bettasso's Post-Collision Text Messages*

Law enforcement obtained copies of Bettasso's cell phone records. On the night of the collision at approximately 10 minutes before 11:00 p.m., Bettasso texted someone and asked that person to call him "'ASAP.'" Thirty minutes later, that person texted, "'I'm going to get it'" and bring it back to his or her house. Minutes before midnight

7

Bettasso asked how it was "'going.'" At 12:25 a.m., the person texted, "'You got to go back there, Bro. What if it wasn't a dog.'"

The two exchanged another series of messages later that morning at approximately 9:00 a.m. Bettasso informed the person that he had picked up the car and looked around but "'didn't see anything.'" The person asked if Bettasso had noticed "'the chunks on the windshield'" and "'a shoe in the street.'" Both acknowledged that the shoe "'freaked [them] out,'" but the other person surmised that it had been lying in the street for months. The person texted, "'You should never have a drink again.'" Bettasso responded, "'You're right, and I won't.'" Later that afternoon, the same person texted Bettasso, "'Who was the tow truck? I wonder if they're gonna know,'" and "'[c]heck out the Desert Sun. It's worse.'"

F. *Prior DUI Convictions*

The parties stipulated that Bettasso had four prior DUI convictions in 2001, 2005, 2013, and 2014. For the 2013 and 2014 convictions, Bettasso admitted that his blood-alcohol content (BAC) level was over .15 percent. Bettasso's driving privileges were revoked as a result of the 2014 conviction and had not been reinstated by the date of the July 2016 collision.

For all three of the convictions after 2001, Bettasso was advised in writing that it is "'"extremely dangerous to human life to drive while under the influence of alcohol.'"'" He was further advised: "'"If I continue to drive while under the influence of alcohol . . . , as a result of my driving someone is killed, I can be charged with

8

murder."'"[5]  Bettasso acknowledged that he received these advisements by checking boxes on the forms containing them.  For the 2013 and 2014 convictions, Bettasso also received verbal warnings containing the same content from the trial judges in those cases.  In February 2015, Bettasso signed a form again acknowledging that he understood "'the dangers of driving under the influence'" and that if he received another DUI "'in which someone is killed because of that crime, California state law allows that I could be charged with murder.'"

DISCUSSION

A.  *Sufficiency of the Evidence of Second Degree Murder*

Bettasso argues that the record does not contain sufficient evidence to support his second degree murder conviction based on a theory of implied malice.  We disagree.[6]

Murder requires "malice aforethought."  (§ 187, subd. (a).)  Murder committed without premeditation and deliberation is of the second degree.  (§ 189; *People v. Elmore* (2014) 59 Cal.4th 121, 133 (*Elmore*).)  Malice may be express or implied for second degree murder.  (§ 188, subd. (a)(1); *Wolfe*, *supra*, 20 Cal.App.5th at p. 681.)  "Malice is

---

[5]     These advisements are commonly referred to as "*Watson* advisements" after *People v. Watson* (1981) 30 Cal.3d 290, 296 (*Watson*) and are required to be given under Vehicle Code section 23593 to any person convicted of a DUI.

[6]     In reviewing the sufficiency of the evidence, we "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)  We "view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."  (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

9

implied when an unlawful killing results from a willful act, the natural and probable consequences of which are dangerous to human life, performed with conscious disregard for that danger." (*Elmore*, *supra*, at p. 133.) Killing a person while driving intoxicated is second degree murder involving implied malice if "a person, knowing that his [or her] conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life." (*Watson*, *supra*, 30 Cal.3d at p. 296.)

In *Watson*, the Supreme Court "held that the following evidence, in combination, was sufficient to support a finding that the defendant had acted with conscious disregard for life: (1) the defendant had consumed enough alcohol to impair his physical and mental faculties, knowing he would have to drive later, and presumably was aware of the hazards of driving while intoxicated; (2) the defendant had driven at high speeds on city streets, creating a great risk of harm or death; and (3) the defendant was aware of the risk, as shown by the near collision and by the belated attempt to brake before the fatal collision." (*People v. Olivas* (1985) 172 Cal.App.3d 984, 988 (*Olivas*); *Watson*, *supra*, 30 Cal.3d at pp. 300-301.) *Watson* did not, however, hold that any of those particular facts or factors are necessary in order to justify a second degree murder conviction in a vehicular homicide case. (*Olivas*, *supra*, at p. 989.) Instead, *Watson* adopted a case-by-case analytical approach. (*Olivas*, at p. 989.)

Bettasso's substantial evidence argument focuses on purported factual differences between this case and other post-*Watson* cases in which there was sufficient evidence of implied malice. He argues that his case differs from those other post-*Watson* cases

10

because some of the factors present in those cases are not present here. For example, Bettasso points out that the record contains no direct or circumstantial evidence of his BAC level. No blood sample was drawn, and no expert testified. He contrasts this with numerous other post-*Watson* cases in which the BAC level of the defendants was over twice the legal limit of .08 percent (Veh. Code, § 23152, subd. (b)). (See, e.g., *People v. McCarnes* (1986) 179 Cal.App.3d 525, 533-535 [sufficient evidence of implied malice based in part on BAC level of .27 percent]; *People v. Murray* (1990) 225 Cal.App.3d 734, 746 ["blood-alcohol level, estimated between .18 and .23 percent"]; *People v. Autry* (1995) 37 Cal.App.4th 351, 358-359 [BAC level of .22 percent].) He contends that there also is no evidence that he drove dangerously before the collision, whereas in other post-*Watson* cases there was evidence that the defendants "drove in a manner that was so dangerous as to support an inference that they actually knew their actions created a risk . . . ."

We find Bettasso's argument unpersuasive. Again, no single factor needs to be present to support a finding of implied malice in a vehicular homicide case, so the existence of factual distinctions between this case and others does not compel any conclusion about the sufficiency of the evidence in this case. Moreover, although the record does not contain evidence of Bettasso's BAC, it does contain ample evidence of his level of drunkenness and the manner of his driving.

Both of Bettasso's colleagues thought that Bettasso was intoxicated at the end of his shift (less than one hour before the collision occurred), and both warned him not to

11

drive. The video recording of Bettasso's work shift that day shows him drinking seven mixed drinks and five shots between 1:21 p.m. and 6:34 p.m. One reasonable inference that could be drawn is that all of those drinks contained alcohol. We reject Bettasso's argument that, given his coworker's testimony about how bartenders sometimes only pretend to pour drinks containing alcohol for themselves, it would have been mere speculation for the jury to conclude that all of those drinks contained alcohol. The jury was free to conclude that Bettasso was not pretending and instead that all of the drinks that he consumed during his shift contained alcohol. Although his coworker did not see him pour those other drinks, she poured the first drink and it contained alcohol. The jury could reasonably infer that the rest did too. That inference is supported by the fact that Bettasso poured two of the shots that he drank from the same bottle from which he poured shots for the customers. In addition, both of his coworkers thought that he was drunk at the end of his shift, and so did several other people with whom he interacted in the next few hours. Combined with Bettasso's history of drinking and driving, inferring that all of the drinks Bettasso consumed that day contained alcohol was not ""'"based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work."'"" (*People v. Davis* (2013) 57 Cal.4th 353, 360.) Instead, that is a logical and reasonable inference based on the evidence adduced at trial.

Moreover, after the collision, Bettasso told his stepdaughter that he had been drinking and hit something with his car. The stepdaughter told law enforcement the next day that when she saw him one hour after he contacted her (at least two hours after the

12

collision), he appeared drunk. Similarly, Bettasso's mother, who saw him over four hours after the collision initially told a police officer that she smelled alcohol on Bettasso's breath and did not think he should have been driving on the night of the accident. The tow truck driver who saw Bettasso even later smelled alcohol on Bettasso's breath too and thought that Bettasso was slurring his words. In addition, Bettasso admitted that in two of his prior DUI convictions he was driving with a BAC of .15 percent or higher. For all of these reasons, regardless of the lack of evidence of Bettasso's precise BAC level, the jury could have reasonably inferred that Bettasso's ability to drive was significantly impaired by intoxication at the time of the accident. (See *McDonald v. Department of Motor Vehicles* (2000) 77 Cal.App.4th 677, 687 ["Under [Vehicle Code] section 23152 '"it is not necessary to prove any specific degree of intoxication, but . . . the question whether the accused was 'under the influence of intoxicating liquor' is a question of fact to be determined by the court or jury from all the proven circumstances of the case"'"].)

There also was sufficient evidence from which a jury could reasonably infer that Bettasso was driving in a highly dangerous manner. Whether Bettasso was driving at "a normal rate of speed," as the investigator suspected, is not dispositive on that issue. Bettasso swerved off the road at approximately 55 miles per hour and traveled several hundred feet before reentering the paved road. The reentry occurred only after hitting a person standing somewhere on the side of the road while it was light outside. At a minimum, Bettasso "was unable to keep [his] vehicle within [his] designated traffic lane

13

due to [his] intoxication.  A jury could reasonably conclude that this inability to stay in a lane does, in fact, qualify as 'highly dangerous' driving, particularly given the dangerous consequences, as unfortunately demonstrated by [the victim's] death."  (*Wolfe*, *supra*, 20 Cal.App.5th at p. 684.)

Bettasso further contends that there was not sufficient evidence that he consciously disregarded a risk to human life by driving, because "he was not *actually aware*" that he was too intoxicated to drive safely.  He claims that the only evidence of his actual awareness was his statement to coworkers that he felt "fine."  That is not true.  When Bettasso told his stepdaughter about the collision, he also told her that he had been drinking at the time that it happened, tending to show that he was aware that he had not been "fine" to drive.  Similarly, the next day he acknowledged to the person with whom he was texting that he should never drink again.  The jury was free to credit that evidence and disbelieve Bettasso's statement to his coworkers that he felt "fine" enough to drive after his shift.  In addition, Bettasso had four prior DUI convictions, and in relation to the last three had received written *Watson* advisements that it was extremely dangerous to human life to drive while under the influence of alcohol and that he could be charged with murder if he killed anyone while doing so.  For the last two, he also received those advisements orally.  He received the last advisement less than one and one-half years before the collision.  "Given [Bettasso's] knowledge of the consequences of driving under the influence—including the possibility of death and a murder conviction—a jury could reasonably infer that [Bettasso] consciously disregarded that knowledge and drove

14

without regard to human life based on [his] level of . . . intoxication." (*Wolfe*, *supra*, 20 Cal.App.5th at p. 683.)

In sum, we conclude that there was sufficient evidence to support the second degree murder conviction.

B. *Failure to Instruct on Vehicular Manslaughter*

Bettasso further contends that the trial court erred by failing to instruct the jury on vehicular manslaughter (§ 192, subd. (c)), which he claims is a lesser included offense of second degree murder. The argument is foreclosed by *People v. Sanchez* (2001) 24 Cal.4th 983, 992 (*Sanchez*), overruled on another ground in *People v. Reed* (2006) 38 Cal.4th 1224, 1228-1229, which held that gross vehicular manslaughter while intoxicated, in violation of section 191.5, is not a lesser included offense of murder.

"A trial court must instruct on all lesser included offenses supported by substantial evidence." (*People v. Duff* (2014) 58 Cal.4th 527, 561 (*Duff*).) That obligation arises "whenever there is evidence in the record from which a reasonable jury could conclude the defendant is guilty of the lesser, but not the greater, offense." (*Ibid.*)

To determine whether one crime is necessarily included in another, courts apply either the accusatory pleading test or the statutory elements test. (*People v. Shockley* (2013) 58 Cal.4th 400, 404 (*Shockley*); *People v. Robinson* (2016) 63 Cal.4th 200, 207 (*Robinson*).) "'Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former. Under the accusatory pleading test, if the facts actually alleged in the

15

accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former.'" (*Shockley*, *supra*, at p. 404.) "When, as here, the accusatory pleading incorporates the statutory definition of the charged offense without referring to the particular facts, a reviewing court must rely on the statutory elements to determine if there is a lesser included offense." (*Robinson*, *supra*, at p. 207; *Shockley*, at p. 404; *People v. Fontenot* (2019) 8 Cal.5th 57, 65 (*Fontenot*).)

Section 187 defines murder as "the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Pertinent here, vehicular manslaughter can be committed in two ways under section 192, subdivision (c).[7] (§ 192, subd. (c)(1)-(2).) A requisite element for both is "driving a vehicle in the commission of an unlawful act." (*Ibid.*) The sections differ on whether gross negligence is required. (*Ibid.*)

The language in the accusatory pleading here tracks the statutory language for murder and does not provide any additional factual allegations about the alleged conduct. Count 1 alleged that Bettasso "did willfully and unlawfully murder Richard H., a human being." We therefore are required to apply the statutory elements test. (*Robinson*, *supra*, 63 Cal.4th at p. 207; *Shockley*, *supra*, 58 Cal.4th at p. 404; *Fontenot*, *supra*, 8 Cal.5th at p. 65.)

The issue therefore is whether a person can commit murder under section 187 without driving a vehicle in the commission of an unlawful act. The answer is obviously

---

**7** There is no allegation that Bettasso knowingly caused the accident for financial gain, so the third way in which vehicular manslaughter can be committed, as defined in subdivision (c)(3) of section 192, is inapplicable.

16

yes: Murder can be committed without driving a vehicle. (See *Sanchez*, *supra*, 24 Cal.4th at p. 992 [gross vehicular manslaughter while intoxicated is not a lesser included offense of murder under the statutory elements test because intoxication and driving a vehicle are not elements of murder].)

Bettasso presents three arguments against application of *Sanchez*'s holding here. First, he argues that *Sanchez* does not apply because it involved gross vehicular manslaughter while intoxicated under section 191.5, not vehicular manslaughter under section 192. We disagree. *Sanchez* held that gross vehicular manslaughter while intoxicated under section 191.5 is not a lesser included offense of murder because intoxication and driving a vehicle are elements of the section 191.5 offense but are not elements of murder. (*Sanchez*, *supra*, 24 Cal.4th at p. 989.) That holding applies to vehicular manslaughter under section 192, because driving a vehicle is an element of the section 192 offense. Indeed, the Supreme Court expressly stated that its "decision . . . does not turn on a distinction between vehicular manslaughter while intoxicated as defined by section 192 and gross vehicular manslaughter while intoxicated as defined by section 191.5." (*Sanchez*, at p. 992, fn. 4.)

Second, Bettasso argues that because *People v. Ortega* (1998) 19 Cal.4th 686, 694, 697 (*Ortega*), overruled on another ground in *People v. Reed*, *supra*, 38 Cal.4th at pp. 1228-1229, held that grand theft of a vehicle is a lesser included offense of robbery even though one can commit robbery without stealing a vehicle, it follows that vehicular manslaughter is a lesser included offense of murder even though one can commit murder

17

without driving a vehicle. We reject this argument because the Supreme Court rejected it in *Sanchez*, *supra*, 24 Cal.4th at pp. 991-992. We are bound by the Supreme Court's holding. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Third, Bettasso notes that the Supreme Court in *Sanchez* distinguished *Ortega*'s holding concerning theft and robbery partly on the ground that section 191.5 was enacted relatively recently (in 1986), whereas longstanding authority has held that theft is a lesser included offense of robbery. (*Sanchez*, *supra*, 24 Cal.4th at p. 992.) On that basis, Bettasso argues that *Sanchez*'s holding should not apply to vehicular manslaughter, which has been a form of manslaughter since 1945 and thus should be covered by the traditional rule that manslaughter is a lesser included offense of murder. Again, we cannot agree. *Sanchez* explained both that section 191.5 is derived from section 192 (*Sanchez*, at p. 992, fn. 4 [the Legislature "moved language formerly contained in section 192 to its current position in section 191.5"]) and that the Court's decision "[did] not turn on a distinction between vehicular manslaughter while intoxicated as defined by section 192 and gross vehicular manslaughter while intoxicated as defined by section 191.5" (*Sanchez*, at p. 992, fn. 4).

For all of the foregoing reasons, we join *Wolfe*, *supra*, 20 Cal.App.5th at pp. 685-686 in holding that vehicular manslaughter under section 192 is not a lesser included offense of murder.

Because vehicular manslaughter with or without gross negligence requires proof of elements that are not necessary to the offense of murder, vehicular manslaughter (as so

18

defined) is not a necessarily lesser included offense of murder.[8]  The trial court therefore did not err by not instructing the jury on those offenses.[9]

DISPOSITION

We affirm the judgment.

CERTIFIED FOR PARTIAL PUBLICATION

MENETREZ _____
J.

We concur:

McKINSTER _____
                Acting, P. J.
FIELDS _____
                J.

---

[8]     Bettasso claims that not treating vehicular manslaughter as a lesser included offense of murder "could potentially create an equal protection problem," because manslaughter is treated as a lesser included offense of murder in nonvehicular homicide cases.  *Wolfe* rejected that argument and concluded that there was not an equal protection violation.  (*Wolfe*, *supra*, 20 Cal.App.5th at pp. 689-690.)  Bettasso provides no reason for us to reject *Wolfe*'s conclusion that the differential treatment of vehicular and nonvehicular manslaughter passes rational basis review.  (*Ibid.*)

[9]     We also reject Bettasso's argument that the trial court's failure to instruct on vehicular manslaughter violated due process or other rights under the federal Constitution.  As our Supreme Court has explained, "there is no federal constitutional right of a defendant to compel the giving of lesser-related-offense instructions" or "to instruction on lesser necessarily included offenses."  (*People v. Rundle* (2008) 43 Cal.4th 76, 148, overruled on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421.)  We are bound by those holdings.  (*Auto Equity Sales, Inc. v. Superior Court*, *supra*, 57 Cal.2d at p. 455.)