Filed 06/30/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B306773 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA074601) |
| v. | |
| DAVION DEMETRIOUS MURPHY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daviann L. Mitchell, Judge. Affirmed with directions.

Stephen M. Vasil, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Michael R. Johnsen, Supervising Deputy Attorney General, and David Williams, Deputy Attorney General for Plaintiff and Respondent.

———————————

Davion Demetrious Murphy appeals from the judgment entered on his three convictions for second degree murder. (Pen. Code, § 187, subd. (a).).[1] Murphy argues the evidence supporting his convictions is insufficient because the prosecution failed to prove he acted with implied malice when, while under the influence of marijuana, he drove his car at nearly 90 miles per hour through a red light and collided with another vehicle, killing its occupants.

We conclude sufficient evidence supported the jury's verdict. Although there is not yet a commonly administered and standardized medical test equivalent to the blood alcohol concentration test that accurately determines a person's level of impairment from lipophilic, psychoactive drugs such as marijuana, there was substantial evidence that at the time of the accident Murphy was impaired from using marijuana. There was also substantial evidence that Murphy acted with implied malice both when he smoked marijuana with the intent to drive, and when he drove in a manner that demonstrated a conscious disregard for human life.

Murphy also asserts the abstract of judgment contains an error. Only Murphy's complaint regarding the abstract of judgment has merit. Accordingly, we affirm and direct the trial court to correct the abstract of judgment.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

2

# FACTUAL AND PROCEDURAL BACKGROUND

*A.     The Fatal Collision and Murder Charges*

On the morning of January 11, 2018, Murphy (then 19 years old) was at his home in Lancaster with his cousin, Anthony Brown, and two friends, Derick James and Nicholas Clayton. The four smoked marijuana, ate breakfast and "rapped for a little bit." Murphy then drove Brown, James and Clayton to the Eastside Car Wash & Quick Lube to get the oil changed in Murphy's silver Lexus.

The surveillance video from the car wash recorded the four men arriving in Murphy's car at 10:39 a.m.[2] When Murphy rolled down the driver's window to speak with the oil change technician, the technician saw smoke coming out of the window and smelled a "strong" odor of marijuana. The smoke and odor emanating from the car caused the technician to back away from the vehicle and rub his eyes.

After Murphy and his companions left the car with the technician, they walked to a courtyard adjacent to the car wash office and waited for the car during the oil change. According to Brown, while waiting they smoked more marijuana.[3] Eventually

---

[2]     The surveillance video that was played for the jury during Murphy's trial showed Murphy and his companions' activities while at the Eastside Car Wash.

[3]     The surveillance video also captured the group's activities in the courtyard. At 10:51 a.m., the video showed Murphy lifting and lowering his hands, one at a time, to his mouth. Detective Ryan Bodily, the lead case investigator, expressed his lay opinion that Murphy's gestures showed he was smoking something. Brown testified that Murphy

the car wash manager asked them to stop smoking marijuana near the door of the car wash office. By then, Brown said he was "feeling woozy" from "the same weed that everyone was smoking." As they walked to get the car, Murphy embraced one Eastside Car Wash employee and then fist bumped another[4] before getting into his Lexus. The surveillance video showed Murphy driving out of the car wash at 11:27 a.m.

Shortly after leaving the car wash the group stopped at a gas station, then drove through a residential neighborhood of Lancaster, traveling east on Avenue J-8, as they headed back to Murphy's house. At approximately 12:00 p.m., when they were about a mile from Murphy's home, Murphy's car ran a red light at the intersection of Avenue J-8 and Challenger Way. Although the posted speed limit was 40 miles per hour, Murphy's car was traveling approximately 88 miles per hour through the intersection.

As Murphy approached the intersection, Tinei Delatorre was stopped at the same intersection in the middle lane of Challenger Way waiting for the signal light in her direction to turn from red to green. To her right, a blue Subaru was waiting at the signal light in the lane closest to the curb. After the signal on Challenger Way turned green, and before Delatorre began to drive into the intersection, Delatorre saw Murphy's silver Lexus "flying from" her left, driving east on Avenue J-8 at "freeway speed." Delatorre said Murphy did not honk his horn to provide a

_____

sometimes smoked cigarettes, but that morning they were all smoking "weed" and "not cigarettes."

[4] There was no testimony presented at trial that Murphy knew the employees he hugged or fist bumped at the car wash.

4

warning of his approach. It appeared to Delatorre that Murphy had "no intention of stopping" at the red light. The blue Subaru in the lane to Delatorre's right had already driven into the middle of the intersection when Murphy's car ran the red light.

Murphy's Lexus broadsided the driver's side of the Subaru. Yovanny Salazar Calzada was driving the Subaru, his wife Rocio Lopez, was in the front passenger seat and his grandmother, Virginia Martinez, sat in the backseat. Calzada, Lopez and Martinez died from multiple blunt force traumatic injuries. Neither Murphy nor his passengers were seriously injured in the accident.[5]

Rochelle Roberts was in her car on Challenger Way near the intersection of Avenue J-8 at the time of the accident. She described the crash, stating it did not appear Murphy's car intended to stop at the red light. Roberts estimated Murphy's car sped through the intersection at over 80 miles per hour. Crystal Aunchman was also an eyewitness; she was in her car, waiting at the signal at the intersection of Challenger Way and Avenue J-8 when the accident occurred. She noticed the occupants inside the

---

[5] Although none of the occupants of the Lexus wore seat belts at the time of the accident, James, Clayton and Brown suffered only minor injuries, and Murphy sustained a broken femur. When first responders arrived at the scene, they found James and Clayton sitting on the curb near the Lexus. Murphy was still in the car, partially hanging out of the passenger side window. Brown was found about 50 feet north of the Lexus in an open field; eyewitnesses reported that immediately after the accident, Brown exited the Lexus and ran into a nearby vacant lot where he collapsed on the ground.

Lexus were "laughing and having a good time" just before the crash.[6]

At noon on January 11, 2018, Jose Ruiz, who lived on the southeast corner of the intersection of Avenue J-8 and Challenger Way, was in his garage when he heard an explosion. He did not hear any car horns or brakes screeching before the collision.

After the accident, Murphy admitted to four different police officers and a paramedic that he had been driving the silver Lexus at the time of the crash. Murphy thought he had been driving south on Challenger Way (not Avenue J-8). As he approached the intersection with Avenue J-8, he saw the traffic light turn red and knew he could not stop in time but claimed he honked his horn while braking as he approached the intersection.

During the investigation officers found three marijuana "canisters" in the Lexus, two of which were empty. The investigators found no skid marks to suggest Murphy tried to brake before the collision.

On April 8, 2019, Murphy was charged with three counts of second degree murder. (§ 187, subd. (a).)[7]

---

[6] Both Roberts and Aunchman testified they saw someone, later identified as Brown, run from the car toward an open field after the accident. At the time of the accident, Roberts and Aunchman believed that the person who ran from the car was the driver of the Lexus.

[7] The information also charged Murphy with driving under the influence of a drug causing injury (Veh. Code, § 23153, subs. (f)), with allegations that he caused bodily injury or death to more than one victim (Veh. Code, § 23558) and inflicted great bodily injury on three people

*B.*    *Trial Proceedings*

    *1.*    *Prosecution's Case*

At trial the prosecution presented testimony from witnesses who described the events from the morning of January 11, 2018, through the time of the crash; the witnesses included Brown,[8] the oil change technician and the eyewitnesses to the collision.  The prosecution presented evidence that Murphy had received multiple warnings about the dangers of driving while under the influence of controlled substances.  Approximately three and a half years earlier, in September 2014, Murphy attended a multi-day educational program for at-risk youth[9] during which he learned about instances of fatalities and dangers caused by drivers who drove under the influence of drugs or alcohol.  Instructors shared personal stories, including one instructor who described being hit by a drunk driver and another who recounted the details of his wife's accident when an intoxicated driver struck her car.  One of the program's purposes was to warn participants about the serious potential

---

(Pen. Code, § 12022.7, subd. (a)).  Before trial the court granted the prosecution's motion to dismiss the Vehicle Code violation charges and the accompanying allegations.

[8]    Brown testified he remembered Murphy getting in the driver's seat of the Lexus when they left the car wash.  However, because of the combined effects of smoking marijuana that morning and the collision, Brown could not recall anything that happened between the time they left the car wash and after the accident.

[9]    On the program intake form Murphy disclosed he first used marijuana at age 11.

consequences of their conduct if they drove under the influence of controlled substances.

In 2016, when Murphy applied for a California driver's license, he acknowledged in the application "that being under the influence of alcohol or drugs, or both, impairs the ability to safely operate a motor vehicle. Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or drugs, or both. If I drive while under the influence of alcohol or drugs, or both, and as a result, a person is killed, I can be charged with murder."[10] After the accident, authorities also found a marijuana container in Murphy's Lexus with a warning label advising it was dangerous to drive while under the influence of marijuana.

### a. *Toxicology Expert Testimony*

The prosecution presented several expert witnesses during trial, including Vanessa Meneses, a forensic scientist in the toxicology section at the Orange County crime lab and the prosecution's expert toxicologist. Meneses described the differences between how alcohol and marijuana are metabolized and measured in the human body and the cognitive and physical effects of marijuana on users. She testified about the toxicology

---

[10] On April 13, 2022, Murphy asked this Court to take judicial notice of the 2017, 2018 and 2020 California Driver Handbooks published by the California Department of Motor Vehicles. The handbooks are not relevant to this appeal; as such, Murphy's request is denied. (See *Coyne v. City and County of San Francisco* (2017) 9 Cal.App.5th 1215, 1223, fn. 3 [denying judicial notice as to documents that were not relevant to court's analysis].)

results of Murphy's blood test after the accident and opined on several hypothetical scenarios that tracked the case's facts.

Regarding the toxicological differences between marijuana and alcohol, Meneses first explained that alcohol is a hydrophilic substance, which means alcohol is metabolized in water-based systems of the body, including blood. A blood test to measure blood alcohol concentration (commonly known as a BAC) therefore provides an accurate measure of the concentration of alcohol in a person's body at the time of a blood draw and a fairly uniform measure of impairment. Additionally, because the body eliminates alcohol at a constant rate, a toxicologist can use a person's BAC at a given point in time to extrapolate that person's estimated BAC at an earlier point in time.

In contrast, Meneses explained marijuana is a lipophilic drug, meaning it is stored in the body's fatty tissue and organs, including the brain. She stated the effect of lipophilic drugs varies from one person to another but that generally, within 90 minutes after a person smokes marijuana, 90 percent of the marijuana will have left the bloodstream and moved into the brain. Blood tests are therefore a less accurate measure of the amount of marijuana present in a person's body at any point in time. Currently there is no test similar to a BAC test for alcohol that accurately determines a person's level of impairment from lipophilic drugs such as marijuana. However, Meneses also testified that blood tests for marijuana could measure the concentrations of certain components of marijuana, including delta-9 tetrahydrocannabinol ("THC") and THC metabolites: (1) carboxy, which is non-psychoactive; and (2) hydroxy, which is psychoactive. Meneses stated toxicologists use carboxy and hydroxy concentrations to calculate "some rough estimates" about

9

when someone last used marijuana. A measurement of carboxy THC can show marijuana in a person's body weeks after the person last used the drug whereas a measurement of hydroxy THC discloses information about more recent ingestion of marijuana.

Meneses stated Murphy's blood was drawn at the hospital at 4:38 p.m. on the day of the accident, about four hours after the collision. The results showed Murphy's blood contained 7.2 nanograms per milliliter of THC, 3.3 nanograms per milliliter of hydroxy THC, and 225 nanograms per milliliter of carboxy THC. Meneses testified that, given hydroxy was detected in Murphy's blood, he probably used marijuana within 24 hours prior to the collision. She also stated the presence of carboxy concentrations greater than 100 nanograms per milliliter indicated Murphy was possibly a chronic marijuana user.

Meneses testified that studies have shown marijuana users may experience cognitive impairment many hours after ingesting the drug. Meneses also stated that many hours after smoking marijuana, well after the feeling of euphoria has worn off, a user may still be impaired. Occasional users might return to their baseline function within three to six hours (with some having cognitive impairments that last up to 24 hours), but it was possible for long-term, chronic users to have more prolonged effects, even after they have abstained from using marijuana for an extended period. Meneses said even if a chronic user had not smoked in 12 hours, psychoactive THC might still be stored in the person's brain, affecting cognition.

Meneses also described the impact that smoking marijuana has on driving. Though effects vary from one person to another, she stated marijuana use tends to have more mental than

physical effects.  In describing those effects, she distinguished between driving "under the influence" of a substance and driving while "impaired" by a substance, explaining a person is "under the influence" when that substance has some effect on the user; a person is "impaired" when mental or physical capabilities are so greatly affected that the person cannot drive a vehicle with the necessary caution and safety of someone who is sober.

Meneses stated that using marijuana can cause a person to experience feelings of euphoria and can have cognitive impacts such as divided attention, the inability to multitask, lack of perception of time and diminished spatial awareness.  She described physical impairments, including difficulties in balance and coordination, increased heart rate and blood pressure as well as a lack of convergence, which hinders a person's ability to distinguish something far from something nearby.  She testified marijuana use imposes challenges to a driver's ability to safely operate a motor vehicle, including impairing focus on the road and affecting reaction time.  She said a driver impaired by marijuana might be incapable of reacting appropriately or timely to unexpected events on the road.  Meneses stated marijuana impairment could also contribute to speeding or driving too slowly, weaving within or outside of one's lane, veering off the road and failing to observe stop signs or traffic signals.

Finally, Meneses offered her expert opinion regarding several hypothetical scenarios that tracked the facts of this case. Meneses opined if a person smoked marijuana between 10:45 a.m. and 11:27 a.m. and was involved in a traffic accident at noon, the person would be within the window of active impairment from marijuana use at the time of the accident.  She also testified if that person had blood taken at 4:00 p.m., with the

11

levels of THC or hydroxy similar to Murphy's at 4:38 p.m., then the person would have been impaired by marijuana at noon. In response to a hypothetical in which Meneses was asked about a driver who was two blocks away from an intersection when a traffic signal was yellow and one block away when the light turned red, but did not apply the brakes and instead drove through the red light crashing into another car, Meneses opined such driving was consistent with the behavior of a driver impaired by marijuana.

> b. *Accident Reconstruction Expert Testimony*

Detective Ryan Bodily testified as the prosecution's accident reconstruction expert. He opined about the speed, rate of acceleration and movements of Murphy's Lexus and the Subaru before and at the time of the collision. Before reaching his opinions, Bodily examined the vehicles, reviewed the data obtained from the vehicles, took measurements at the crash site, observed the vehicles after the accident and interviewed eyewitnesses.

Bodily testified Murphy's Lexus was on Roden Avenue and turned right onto Avenue J-8, traveling east. The Subaru was traveling north on Challenger Way. The Lexus went through a red light and collided with the Subaru in the middle of the intersection. After the cars collided, the Lexus slid sideways on its tires, hit the curb and toppled onto its passenger side. While on its passenger side, it rotated 180 degrees so that the rear end of the car was pointing east. As the Lexus decelerated, friction from the car's tires and body caused it to turn back up onto its wheels.

After the Lexus struck it, the Subaru spun around, hit and rotated around a pole and spun into a vacant lot. The impact

sent the Subaru north, and it came to rest in a dirt field northeast of the intersection.

Bodily said he used the data obtained from the cars and various measurements to determine the Lexus was traveling at 88.1 miles per hour when it collided with the Subaru.[11] The posted speed limit was 40 miles per hour. Bodily stated there was no evidence that Murphy applied the brakes before colliding with the Subaru.

Bodily explained that investigators measure vehicles' locations, skid marks and scrapes at a collision scene and use that data to create a factual diagram they can later use to reconstruct the accident.[12] Bodily testified that the type of collision determines the kind of mathematical formula he uses to evaluate the accident. In this instance he used "momentum equations"; he started from the vehicles' respective resting places and worked backward to determine what Bodily called "the speed zones" as each car moved. He used the damage to the two cars to determine the angle of impact. From this, he determined the Lexus swerved in the last few feet before impact, causing it to collide with the Subaru at an 81 degree angle.

---

[11] The Subaru, but not the Lexus, had an event data recorder. Bodily used the Subaru's event data and determined the Subaru's speed at impact was 32.3 miles per hour. He used the Subaru's speed to determine the Lexus's speed at impact.

[12] Bodily used software to create a factual diagram. The software had a "reconstruction component" that allowed Bodily to enter data, and the program then generated the reconstruction. Bodily also checked the software's calculations.

13

Bodily said he used software to create two animations depicting his reconstruction of the accident, one from the perspective of someone standing on the northeast corner of the intersection and one from the Lexus driver's perspective. He synced the animation with traffic signal phasing data from the City of Lancaster. At this intersection, the traffic light first turned yellow for five seconds to give oncoming cars a chance to pass through the intersection or come to a stop. Then, the traffic light turned red in all four directions for two seconds to create an all-clear safety zone for opposing traffic.

To create his animation, Bodily placed both cars at the point of impact and then moved backward in time at one second increments to place the Lexus where he thought it would have been when the light turned red and when the light turned yellow. He used data from the collision scene and published data about each vehicle, including acceleration rates.

Bodily proposed two possibilities for how the Lexus traveled down Avenue J-8. In one scenario, Murphy's Lexus could have rounded the corner of Roden and Avenue J-8 at the average turning speed of 10 miles per hour, then immediately accelerated to 88 miles per hour and maintained that speed until the collision. Alternatively, Bodily thought the Lexus could have initially accelerated to 40 miles per hour, maintained that speed, and then accelerated when the light turned yellow. Although he acknowledged both scenarios were possible, he opined "the more realistic scenario" based on his conversations with his colleagues and the prosecutors was that the Lexus had been driving at a constant speed of 88 miles per hour. While Bodily conceded he did not know which of the two scenarios was correct, he concluded in either case, if Murphy had applied his brakes when

14

the light turned red, he would have stopped before colliding with the Subaru.

### 2. *Murphy's Defense and Conviction*

At trial, Murphy's defense focused exclusively on the theory that one of the other men in the Lexus had been driving at the time of the crash. Consistent with that theory, Murphy presented the eyewitness testimony of Roberts and Aunchman, who attested that Brown, who ran from the Lexus after the accident, was the driver of the Lexus. Murphy's counsel also cross-examined various prosecution experts on the DNA evidence collected from the Lexus and the types of injuries the occupants of the Lexus sustained in the accident.[13]

The jury convicted Murphy of three counts of second degree murder (§ 187, subd. (a)).) The court sentenced him to three concurrent terms of 15 years to life in prison, imposed various fines and fees and gave him presentence custody credit.

Murphy timely appealed.

## DISCUSSION

### I. *Sufficient Evidence Supported Murphy's Convictions for Second Degree Murder*

Murphy argues the prosecution did not present sufficient evidence to support his second degree murder convictions because, based on the evidence that was presented at trial, no reasonable jury could have found he acted with implied malice when he drove his Lexus through the red light at the intersection

---

[13] On appeal Murphy does not dispute that he was the driver.

of Avenue J-8 and Challenger Way and collided with the Subaru. According to Murphy, although the evidence of his conduct may have been enough to sustain a finding that a reasonable person in Murphy's position would have been aware of the risk involved—which is the standard for gross vehicular manslaughter—it was not enough to sustain the jury's finding that Murphy was subjectively aware his actions endangered human life, which was necessary to support an implied malice second degree murder conviction.

### A. Standard of Review

In reviewing a claim for sufficiency of the evidence, we determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Flinner* (2020) 10 Cal.5th 686, 748.) We review the entire record to determine whether it discloses sufficient evidence—that is, evidence that is reasonable, credible and of solid value—supporting the decision and not whether the evidence proves guilt beyond a reasonable doubt. (*Ibid*.) Our application of this standard of review does not permit reweighing the evidence or reevaluating the credibility of witnesses. (See *People v. Stewart* (2000) 77 Cal.App.4th 785, 790.) Instead, we presume the existence of every fact the jury reasonably could have deduced from the evidence in support of the judgment. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*).) We discard evidence that does not support the judgment as having been rejected by the trier of fact for lack of sufficient verity. (*People v. Ryan* (1999) 76 Cal.App.4th 1304, 1316.) And if the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because

16

the circumstances might also reasonably be reconciled with a contrary finding.  (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890 (*Covarrubias*); accord, *People v. Houston* (2012) 54 Cal.4th 1186, 1215.)  Consequently, "[a] reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*Zamudio,* at p. 357.)

### B.    *Implied Malice Second Degree Vehicular Murder*

Murder is the unlawful killing of a human being with express or implied malice aforethought.  (§§ 187, subd. (a), 188; accord, *People v. Rangel (*2016) 62 Cal.4th 1192, 1220.)  Malice is "express" when a person manifested a deliberate intention to unlawfully take away the life of another human being; it is implied when there was no considerable provocation or when the circumstances attending the killing show an abandoned and malignant heart.  (*People v. Soto* (2018) 4 Cal.5th 968, 974. (*Soto*).)

Implied malice has ""'both a physical and a mental component.  The physical component is satisfied by the performance of 'an act, the natural consequences of which are dangerous to life.' [Citation.]  The mental component is the requirement that the defendant 'knows that his conduct endangers the life of another and acts with conscious disregard for life.'"'" (*Soto, supra,* 4 Cal.5th at p. 974, quoting *People v. Watson* (1981) 30 Cal.3d 290, 300 (*Watson*).)  That is, "malice may be implied when [the] defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life." (*Watson,* at p. 300.)  "Implied malice is determined by examining the defendant's subjective mental state to see if [the defendant]

17

appreciated the risk of [the defendant's] actions. [Citations.] Malice may be found even if the act results in a death that is accidental. [Citation.] It is unnecessary that implied malice be proven by an admission or other direct evidence of the defendant's mental state; like all other elements of a crime, implied malice may be proven by circumstantial evidence." (*People v. Superior Court (Costa)* (2010) 183 Cal.App.4th 690, 697.)

To support a finding of implied malice, the evidence must establish the defendant deliberately committed an act, the natural consequences of which were dangerous to life, with knowledge of the act's danger to life and a conscious disregard of that danger. (*Watson, supra,* 30 Cal.3d at p. 300.) This conscious disregard for the danger to life distinguishes implied malice from gross negligence, which involves "the exercise of so slight a degree of care as to raise a presumption of conscious indifference to the consequences." (*Id.* at p. 296.) "Phrased in everyday language, the state of mind of a person who acts with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.' The state of mind of the person who acts with conscious indifference to the consequences is simply, 'I don't care what happens.'" (*People v. Olivas* (1985) 172 Cal.App.3d 984, 987-988 (*Olivas*).) The standard for implied malice is subjective and requires the defendant appreciate the risk involved. (*Watson, supra,* at pp. 296-297.)

*Watson* is the leading case on vehicular murder involving implied malice. (*Watson, supra,* 30 Cal.3d 290.) There, the defendant drove to a bar and consumed a large quantity of beer. After leaving the bar, he drove through a red light and narrowly

18

avoided a collision with another car.  He then drove away at high speed, accelerating to 84 miles per hour before suddenly braking and skidding into an intersection where he collided with another car, killing two people.  Watson's blood alcohol level half an hour after the collision was 0.23 percent.  An information charged him with two counts of second degree murder, but the trial court dismissed the murder counts.  (*Id.* at pp. 293-294.)

The California Supreme Court reversed the dismissal on the People's appeal, holding sufficient evidence existed to uphold the second degree murder counts in the information.  (*Watson, supra,* 30 Cal.3d at p. 301.)  The court found the following evidence as sufficient to support a finding that the defendant acted with conscious disregard for life:  the defendant's blood alcohol level supported a finding that he was legally intoxicated; he drove to the establishment where he was drinking, knowing he had to drive later; he presumably was aware of the hazards of driving while intoxicated; he drove at high speeds on city streets, creating a great risk of harm or death; and he was aware of the risk, as shown by the near-collision and his belated attempt to brake before the fatal collision.  (*Id.* at pp. 300-301.)

Since *Watson*, numerous appellate courts have upheld murder convictions in cases where defendants have committed homicides while driving under the influence of alcohol and other controlled substances.  (See, e.g., *People v. Wolfe* (2018) 20 Cal.App.5th 673, 683 (*Wolfe*) [driver had a blood alcohol level of 0.34 percent, was aware of the dangers of drinking and driving and had previously used a taxi service, drank intending to drive home, and continued driving her damaged vehicle after hitting a pedestrian]; *People v. Autry* (1995) 37 Cal.App.4th 351, 358–359 (*Autry*) [driver had a blood alcohol level of 0.22 percent, was

19

warned of the dangers of drinking and driving, drank and drove throughout the day, had three near misses, and continued driving over protests of his passengers]; *People v. Murray* (1990) 225 Cal.App.3d 734, 746-747 (*Murray*) [driving wrong way on a freeway with a blood alcohol level between 0.18 and 0.23 percent]; *People v. McCarnes* (1986) 179 Cal.App.3d 525, 533 [crossing into oncoming traffic on a two-lane highway with a blood alcohol level of 0.27 percent]; *Olivas, supra,* 172 Cal.App.3d at p. 989 [extremely dangerous driving while under the influence of PCP and "negligible" amount of alcohol].)  These opinions have generally relied on some or all of the factors that were present in *Watson:*  "(1) blood-alcohol level above the .08 percent legal limit; (2) a pre-drinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving." (*Autry, supra,* at p. 358.)

Although the *Watson* factors are relevant to the determination of implied malice vehicular murder, courts have also recognized that "there is no particular formula for analysis of vehicular homicide cases, instead requiring a case-by-case approach." (*Costa, supra,* 183 Cal.App.4th at p. 698 [citing cases].)  Indeed, lack of intoxication or the absence of driving at a high rate of speed to evade police "'does not preclude a finding of [implied] malice.'"  (*Ibid.*, quoting *People v. Contreras (*1994) 26 Cal.App.4th 954, 955.)

The opinion in *People v. Moore* (2010) 187 Cal.App.4th 937 (*Moore*) is instructive on this point.  There, the defendant drove 70 miles per hour in a 35 mile per hour zone, ran a red light and struck and killed another motorist.  Moore was sober, told the police he did not intend to kill anyone and was convicted of second degree murder.  (*Id.*, at p. 940.)  Division Six of this

20

District affirmed, holding the act of driving 70 miles per hour in a 35 mile per hour zone, crossing into the opposing traffic lane, and running a red light "went well beyond gross negligence . . . .  [¶] Whether Moore was subjectively aware of the risk is best answered by the question:  how could he not be?  It takes no leap of logic for the jury to conclude that because anyone would be aware of the risk, Moore was aware of the risk." (*Id.* at p. 941.)

Courts have also concluded a finding of implied malice in the context of vehicular murder does not require "a 'predicate act'" such as a prior driving under the influence (DUI) conviction, a DUI-related accident, or a judicial or drug rehabilitation-related admonition of the dangers of driving while intoxicated. (*People v. Johnigan* (2011) 196 Cal.App.4th 1084, 1091-1092.)

### C.    Analysis

We have considered the *Watson* factors and the subsequent cases that applied those factors, and we conclude substantial evidence in the record supported the jury's finding of implied malice for Murphy's second degree murder convictions.

First, regarding the *Watson* impairment factor, as the *Moore* court recognized, implied malice for vehicular murder may be found based on the totality of the circumstances.  (See *Moore, supra,* 187 Cal.App.4th at pp. 941-942.)  It may exist in the absence of evidence of drug use, impairment or excessive speed. (*Ibid.*)  However, here the prosecution presented sufficient evidence from which the jury could reasonably infer Murphy was under the influence of marijuana when he ran the red light and struck the Subaru.  Even though the toxicology expert testified there is no equivalent to the BAC test to predict the degree of impairment from smoking marijuana, other evidence was presented to support a finding that Murphy was impaired by

21

marijuana before the accident. The jury could reasonably infer, from the substantial evidence presented, that Murphy smoked marijuana several times in the hours before the accident—Brown testified Murphy smoked marijuana before Murphy drove them to the carwash; the oil change technician testified smoke that smelled of marijuana poured out of Murphy's Lexus when they arrived at the car wash, implying Murphy smoked marijuana while driving to the car wash; and the surveillance video from the car wash courtyard shows Murphy engaging in conduct suggesting he continued to smoke marijuana after he arrived at the car wash about an hour before the accident.

Although the record does not contain evidence as to the amount of marijuana Murphy smoked or its potency, the toxicology evidence showed Murphy had a significant quantity of psychoactive THC in his blood four hours after the accident, which indicated he had recently ingested marijuana. Based on the quantity of psychoactive THC in Murphy's blood, the toxicology expert hypothesized that a similarly situated person would likely have been actively impaired at the time of the collision.

Other evidence in the record suggests Murphy was under the influence (meaning he was experiencing the psychoactive effects of the marijuana) shortly before the accident. For example, the jury could infer Murphy was under the influence of marijuana based on his inexplicably exuberant conduct at the car wash when, for no apparent reason, he embraced and fist bumped the employees, who appeared to be strangers.[14] Moreover, an

---

[14] In his reply brief Murphy suggests his embrace of the car wash employee might be explained by something other

22

eyewitness stated that moments before the accident as he sped through the red light in a residential area traveling nearly 90 miles an hour, Murphy was "laughing and having a good time," which implies he was distracted rather than focused on the road.

Furthermore, the circumstances of the crash also demonstrate Murphy was impaired. Murphy was driving at more than twice the posted speed limit at the time of the accident and did not attempt to apply the brakes or honk the horn before colliding with the Subaru. Notwithstanding the length of time Murphy traveled on Avenue J-8 after the traffic light turned yellow and then red, he did not take any measures to prevent the collision. As the toxicology expert testified, excessive speed and delayed reaction are consistent with marijuana impairment.

Second, regarding the *Watson* "pre-drinking intent to drive" factor, the jury could have inferred Murphy smoked marijuana at the car wash knowing he would resume driving when his car's oil change was complete. (See, e.g., *Wolfe, supra*, 20 Cal.App.5th at

---

than his marijuana use. Murphy posits this evidence could also support a finding that he and the car wash employee were friends or had a pre-existing relationship. In his petition for rehearing, Murphy also suggests, for the first time, that his conduct could be explained as a "well-known type of greeting in the African-American community." However, the fact that Murphy's conduct might suggest something other than being under the influence of marijuana does not warrant a reversal given the applicable standard of review. (See *Covarrubias, supra,* 1 Cal.5th at p. 890 [holding that in reviewing for substantial evidence, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding].)

23

p. 683 [concluding the jury could have reasonably inferred that before the defendant began drinking, she intended to drive herself home from the bar because she had left her car at the bar earlier in the day].)  Moreover, the jury could infer from the evidence of marijuana smoke inside the car when Murphy arrived at the car wash that Murphy smoked marijuana while driving to the car wash.  (See *Autry, supra,* 37 Cal.App.4th at p. 358 [finding a pre-drinking intent to drive based on evidence that throughout the day, defendant drove and drank, including driving to obtain more alcohol and drinking while driving].)

Third, applying the *Watson* factor concerning the dangerousness of a defendant's driving, Murphy's driving was exceedingly reckless before the collision.  Eyewitness accounts and physical evidence from the accident scene demonstrate Murphy drove through a red light at a speed of 88.1 miles per hour (more than 48 miles per hour over the applicable speed limit) in a residential neighborhood without braking or honking the car horn.  We consider, as the court did in *Moore*, whether Murphy was subjectively aware of the risk, and similarly conclude Murphy was aware—"It takes no leap of logic for the jury to conclude that because anyone would be aware of the risk, [defendant] was aware of the risk." (*Moore, supra,* 187 Cal.App.4th at p. 941.)  A reasonable juror could conclude the totality of Murphy's conduct evidenced a conscious disregard of the danger he posed to the lives of others on the roadway.

Finally, regarding the *Watson* factor of a defendant's knowledge of the hazards of driving under the influence, here the prosecution presented substantial evidence Murphy was aware of those dangers.  He received multiple warnings about the dangers of driving while under the influence of controlled substances.

24

Instructors at his youth educational program shared personal accounts of the dangers of driving while under the influence of alcohol and drugs.  Murphy also signed a driver's license application affirming he had been advised that driving under the influence of alcohol or drugs could lead to a murder charge.  Finally, during the accident, in his car, Murphy had a marijuana container labeled with a specific warning against driving under the influence of marijuana.

In reaching our conclusion, we reject Murphy's argument that the warnings he received through the at-risk youth program, his driver's license application and the marijuana canister label were legally insufficient to prove his subjective awareness of the danger of driving under the influence.  Murphy claims the warnings were ineffective because they failed to inform him of how to determine whether he was under the influence of drugs.  Murphy offers no legal support for his argument that the warnings were defective.  On the contrary, courts have found similar warnings sufficient under *Watson* to prove subjective awareness.  (See, e.g., *Wolfe, supra,* 20 Cal.App.5th at p. 683 [admonition in the driver's license application]; *Autry, supra*, 37 Cal.App.4th at pp. 358-359; [attendance in treatment programs addressing the dangers of intoxicated driving]; *Murray, supra,* 225 Cal.App.3d 736, 736. [driver's educational classes].)  In addition, given the evidence that Murphy was a chronic marijuana user, the jury could reasonably infer he had sufficient experience with marijuana to know whether he was under the influence, even if he had not attended an educational program on the topic or otherwise received cautions or warnings about the dangers of driving while under the influence of drugs.

25

On appeal Murphy also argues the expert toxicologist's testimony about impairment proves the evidence supporting his conviction is insufficient. Because the toxicologist testified that a marijuana user might be impaired by marijuana and yet lack the subjective awareness of being under the drug's influence, he concludes the prosecutor was required, but failed, to prove he was subjectively aware of his impairment at the time of the accident or understood how the body metabolized marijuana. This argument is unconvincing and flawed in two respects.

First, Murphy's premise is based on an inaccurate characterization of the toxicologist's testimony regarding the stages of impairment after ingestion of marijuana. The toxicologist's testimony supports the conclusion that most people who smoked marijuana would feel the psychoactive effects about 90 minutes after smoking because by then, the THC would have moved from the bloodstream into the brain. She then explained that hours after smoking, some individuals would still be impaired and yet no longer experience the euphoric effects of marijuana, and thus not realize they were still impaired. The toxicologist did not suggest that someone such as Murphy, who caused a fatal car accident about 90 minutes after smoking marijuana, would be unaware of his impairment. Here, there was sufficient evidence based on the totality of his conduct on the morning of the accident, including how he drove and his behavior at the car wash, for the jury to infer Murphy knew he was impaired.

Second, Murphy's argument improperly collapses the knowledge that a person has before becoming voluntarily impaired (about the potential consequences of the person's actions while intoxicated) with the person's intent after

26

impairment. If a person knows—for example, from prior experience with drugs and alcohol or from warnings the person received—that driving under the influence of such substances is extremely dangerous, then ingesting marijuana, and proceeding to drive, could readily be deemed to establish "conscious disregard" for the lives of others, satisfying the intent element for implied malice. (*Watson, supra*, 30 Cal.3d 290.) The vehicular manslaughter statutes have codified the reasoning of *Watson*. (See § 191.5, subd. (e).)

Murphy has offered no legal authority that requires prosecutors, in order to secure convictions, to prove defendants possess a subjective awareness of their level of intoxication. This requirement could give rise to the absurd outcome in which defendants may escape liability for implied malice vehicular murder if they establish they were so intoxicated when they were driving and killed someone that they no longer possessed awareness of their impairment. The law contains no such requirement.

Murphy also challenges the evidence related to his speed at the time of the accident. Specifically, he argues the expert opinion and lay eyewitness evidence that he was traveling at more than 88 miles per hour when he ran the red light is insubstantial.

Concerning the accident reconstruction expert's testimony, Murphy contends that the expert's opinion about his rate of acceleration before the accident, as well as his speed at the time of impact, lacked foundation and was conclusory. Murphy complains the expert failed to explain a "speed zone" and did not justify why he believed Murphy began driving at a constant rate

27

of speed when he turned the corner from Roden to Challenger Way.

Murphy's attack on the accident reconstruction expert's opinion fails because it is not a proper challenge to the sufficiency of the evidence. Instead, Murphy's complaints are about the admissibility of the expert opinion—that is, whether the prosecution laid a proper foundation for the opinion and what weight the opinion should have been given. These complaints do not succeed here because Murphy failed to object to the accident reconstruction expert's testimony in the trial court. (See Evid. Code, § 353; accord, *People v. Clark* (2016) 63 Cal.4th 522, 603 ["Defendant's failure to object on this specific [evidentiary] ground below forfeits his claim on appeal"].) Murphy also had the opportunity to cross-examine the accident reconstructive expert and to argue to the jury that they should give the expert's opinion no weight, but he did not do so. Instead, Murphy's trial defense focused exclusively on his claim that he was not the driver of the Lexus at the time of the collision, and thus, the prosecution had charged the wrong person.

Murphy's challenge to the lay witness opinions regarding his speed is equally unavailing. He complains the eyewitness testimony that he was driving at "highway speed" and more than 80 miles an hour was weak and inadmissible because it lacked foundation. But like his challenge to the expert testimony about his speed, the complaint about the eyewitness testimony is misplaced because it relates to the weight and admissibility of evidence—arguments he should have made in the trial court to the judge and jury. In any event, the eyewitness testimony about the speed of Murphy's car was proper. Cases allowing lay opinion testimony uniformly hold that a lay opinion based on a witness's

28

personal observation, including observation about the speed of a vehicle, is admissible.  (See *People v. Chapple* (2006) 138 Cal.App.4th 540, 547 [recognizing lay opinion testimony based on the witnesses' perceptions that someone is intoxicated, angry, or driving a motor vehicle at an excessive speed is admissible and an accurate means to convey that information to a jury].)

In sum, Murphy's arguments misapprehend the operation of the sufficiency of the evidence standard on appeal.  The questions before us are not what weight the evidence should have been accorded, or whether it could have supported a different verdict.  Instead, the question is whether, considering the evidence in the light most favorable to the judgment, the evidence taken as a whole supports the verdicts reached.  We conclude it does.

## II.  *The Trial Court Must Correct the Abstract of Judgment*

Murphy argues the abstract of judgment must be corrected because the trial court imposed concurrent sentences of 15 years to life for Murphy's three murder convictions,  but the abstract of judgment does not provide that his sentences are to run concurrently.  He points out that the first page of the abstract of judgment, box 6, indicates the sentence as "15 years to Life on counts 1, 2, 3," but the table listing the convictions does not state that the sentences are to run concurrently.  The Attorney General concedes this point.  We agree and direct the trial court to correct the abstract. (See *People v. Amaya* (2015) 239 Cal.App.4th 379, 385 [acknowledging that a court may correct clerical errors in a judgment].)

29

## DISPOSITION

The judgment is affirmed. The trial court is directed to prepare a corrected abstract of judgment stating the sentences for Murphy's murder convictions are to run concurrently and to forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.


WISE, J.*


We concur:



SEGAL, Acting P. J.



FEUER, J.

---

*  Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.